# IN RE JOSHUA S.

## (SC 16561)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued December 6, 2001—officially released May 14, 2002

*Robert T. Rimmer*, with whom, on the brief, was *Ronald T. Scott*, for the appellants (intervenor Chad P. et al.).

*Maureen D. Regula*, assistant attorney general, with whom were *John E. Tucker*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Dominick J. Thomas, Jr.*, with whom, on the brief, was *Christine L. Curtiss*, for the appellees (intervenor Aldo V. et al.).

*Opinion*

SULLIVAN, C. J. This appeal arises out of a dispute between, on one side, the named testamentary guardians of a neglected child and, on the other side, the department of children and families (department) and the child's foster parents. After a trial to determine

the disposition of the child, the trial court rendered judgment appointing the foster parents as the child's custodians and the department as the child's statutory parent. The testamentary guardians appealed.

The testamentary guardians, Chad P. and Sara P. (Ps), claim on appeal that the trial court improperly: (1) concluded that the petitioner, which was the department, and the foster parents, Aldo V. and Lisa V. (Vs), had rebutted the presumption that it would be in the best interests of the minor child, Joshua S., to permit the Ps to serve as guardians even though the trial court found them to be fit, suitable and worthy custodians for Joshua S.; (2) vested care and personal custody of Joshua S. with the Vs, on the sole basis of the bond that existed between Joshua S. and the Vs, even though that bond was allowed to form and solidify solely as a result of the misconduct and improper actions of the department; (3) concluded that the department should be appointed as Joshua S.' statutory parent after determining that the department had engaged in misconduct; (4) concluded that the Superior Court, rather than the Probate Court, had authority to appoint a statutory parent for Joshua S.; and (5) denied the Ps' motion to dismiss the case for lack of subject matter jurisdiction. We affirm the judgment.

The record reveals the following relevant facts and procedural history. During the early morning hours of June 10, 1999, Kelly S., a woman with a long history of psychiatric problems,[1] stabbed to death her husband, Charles S., in the bedroom of their East Hartford home. Awakened by the screams of Charles S., Kelly S.' then nine year old daughter, Jessica M., ran into the same bedroom, where Kelly S. then began to stab her repeat-

[1] Kelly S.' psychiatric history indicated that she had been diagnosed with bipolar disorder, had attempted suicide, and had received psychiatric treatment.

edly. Jessica M. ran from the bedroom and down the hall, while being pursued by Kelly S. Kelly S. then doused herself, Jessica M. and a bedroom with gasoline, and set the house on fire. Kelly S. and Charles S., as well as two of their children, Jennifer S., nearly three years old, and Jonah S., one and one-half years old, died in the conflagration. Their son, Joshua S., then two months old, survived.

Jessica M. managed to escape and ran from the house across the street to the home of the Ps, who were neighbors and friends of Kelly S. and Charles S. Awakened upon hearing screams for help, the Ps witnessed "a blaze of fire" running toward their house. After recognizing the individual as Jessica M. and seeing that her hair was on fire, Sara P. instructed her to roll on the Ps' front lawn. Sara P. also threw water on her to help put out the fire. In the meantime, Chad P. telephoned for emergency assistance. As Sara P. pulled Jessica M. into the house, Jessica M. stated, "[m]y Mommy had a nightmare and she killed my Daddy." Soon thereafter, Sara P. noticed that her arms were covered in blood from Jessica M.'s multiple stab wounds. Sara P. then locked the front door and got blankets to wrap Jessica M. During this horrific ordeal, the Ps' five year old son, Caleb, had gotten out of his bed and witnessed Sara P. tending to the burned and bleeding Jessica M.[2]

Thereafter, emergency assistance arrived and paramedics tended to Jessica M. in the Ps' living room for approximately twenty minutes before transporting her by ambulance to the Connecticut Children's Medical Center (hospital), where she underwent surgery to close up the sixty-one stab wounds she had suffered. At some point, Sara P. told the firefighters where in the house the members of the S. family slept. Soon

---

[2] The Ps also have a daughter, Rachel P., who remained asleep throughout the incident.

thereafter, a firefighter rescued Joshua S., carried him out of the burning house to the front lawn and began administering cardiopulmonary resuscitation. Joshua S. also was taken by ambulance to the hospital for further treatment and hospitalization.[3]

On June 11, 1999, because Joshua S. and Jessica M. were both in critical condition and had no one to make decisions for them on medical issues and other matters, the department filed in the Superior Court a petition to have them adjudicated as neglected and uncared-for dependent children, pursuant to General Statutes §§ 46b-120, 46b-121 and 46b-129, and a motion for temporary custody, pursuant to § 46b-129 (b).[4] The grounds

---

[3] As a result of the serious nature of his condition, Joshua S. was transported from the hospital to the burn unit at Massachusetts General Hospital for treatment for his burns and severe smoke inhalation. Joshua S. was transferred back to the hospital for further treatment on June 14, 1999.

[4] General Statutes § 46b-129 provides in relevant part: "(a) . . . [T]he Commissioner of Children and Families or any child-caring institution or agency approved by the Commissioner of Children and Families, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the Superior Court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, except as otherwise provided in subsection (k) of section 17a-112, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 46b-128, and said court shall further give notice to the petitioner and to the Commissioner of Children and Families of the time and place when the petition is to be heard not less than fourteen days prior to the hearing in question.

"(b) If it appears from the specific allegations of the petition and other verified affirmations of fact accompanying the petition and application, or subsequent thereto, that there is reasonable cause to believe that (1) the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings and (2) that as a result of said conditions, the child's safety is endangered and immediate

relied on by the department were that the children were neglected, uncared-for and abused, that their parents were now deceased, and that the children were now homeless and in need of a legal guardian.[5] An ex parte order of temporary custody was issued on June 11, 1999. Thereafter, on June 18, 1999, at a hearing before the Superior Court, *Dyer, J.*, the department alerted the court that mirror wills executed by Charles S. and Kelly S. had been located in their home and that the wills named the Ps as testamentary guardians for Joshua S. The court was further made aware that Chad P. had been approached by the department but had indicated to the department that he and Sara P. were not interested in assuming custody of Joshua S.

Thereafter, on June 18, 1999, the trial court reaffirmed the ex parte order of temporary custody. Upon his discharge from the hospital on June 22, 1999, Joshua S. was placed in the temporary care of the Vs.

On July 19, 1999, a contested hearing was held in Probate Court concerning the wills of Charles S. and Kelly S. The Probate Court ultimately admitted both wills to probate. Because of the pendency of the neglect petition in the Superior Court, however, the Probate

---

removal from such surroundings is necessary to ensure the child's safety, the court shall either (A) issue an order to the parents or other person having responsibility for the care of the child or youth to appear at such time as the court may designate to determine whether the court should vest in some suitable agency or person the child's or youth's temporary care and custody pending disposition of the petition, or (B) issue an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody. A preliminary hearing on any ex parte custody order or order to appear issued by the court shall be held within ten days from the issuance of such order. . . ."

[5] Immediately after this tragic event, Jessica M.'s putative biological father, Frank P., was located in Minnesota and indicated his desire to obtain custody of Jessica M., pending paternity test results. On the basis of the paternity testing results, the Juvenile Court accepted Frank P.'s paternity of Jessica M. The department eventually placed Jessica M. with him in Minnesota. Jessica M. is, therefore, not a party to this appeal.

Court declined to address the issue of Joshua S.' guardianship, despite the Ps having been named as testamentary guardians.

On July 23, 1999, the department filed a motion with the Superior Court seeking to be appointed as Joshua S.' statutory parent for the purpose of facilitating his adoption, as well as for continuing the jurisdiction of the Superior Court for approval of adoption, pursuant to General Statutes §§ 45a-623, 46b-121 (b), 45a-725 (a) and 45a-718 (a).[6] On July 28, 1999, the Superior Court

---

[6] General Statutes § 45a-623 provides: "In any proceeding under sections 45a-603 to 45a-622, inclusive, that is contested, the Court of Probate shall, upon motion of any party other than a party who made application for the removal of a parent as a guardian, under rules adopted by the judges of the Supreme Court, transfer the case to the Superior Court. In addition to the provisions of this section, the Court of Probate may, on the court's own motion or that of any interested party, transfer the case to another judge of probate, which judge shall be appointed by the Probate Court Administrator from a panel of qualified probate judges who specialize in children's matters. Such panel shall be proposed by the Probate Court Administrator and approved by the executive committee of the Connecticut Probate Assembly. The location of the hearing shall be in the original court of probate, except upon agreement of all parties and the Department of Children and Families, where applicable. If the case is transferred and venue altered, the clerk of the Court of Probate shall transmit to the clerk of the Superior Court or the probate court to which the case was transferred the original files and papers in the case." This statute includes changes effected by Public Acts 2000, No. 00-75, which added provisions regarding transfer of a case to another judge of probate appointed by the Probate Court administrator from a panel of qualified probate judges specializing in children's matters. This amendment has no bearing on the issues currently before the court.

General Statutes § 46b-121 (b) provides in relevant part: "In juvenile matters, the Superior Court shall have authority to make and enforce such orders directed to parents, including any person who acknowledges before said court paternity of a child born out of wedlock, guardians, custodians or other adult persons owing some legal duty to a child, youth or youth in crisis therein, as it deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child, youth or youth in crisis subject to its jurisdiction or otherwise committed to or in the custody of the Commissioner of Children and Families. . . ."

General Statutes § 45a-725 provides in relevant part: "A minor child shall be considered free for adoption and the Court of Probate may grant an application for the appointment of a statutory parent if any of the following

granted intervenor status, for dispositional purposes only, to the Vs, who are Joshua S.' foster parents, and to the Ps, because they were named in his parents' wills as testamentary guardians.[7] In addition, by the agreement of all parties, the Superior Court found, by a fair preponderance of the evidence, that Joshua S. was neglected by his parents.[8]

On October 15, 1999, another hearing was held before the Superior Court to address various pending motions, including the department's motion to appoint itself as Joshua S.' statutory parent and the Ps' motion to dismiss for lack of subject matter jurisdiction.[9] The court ulti-

---

have occurred: (a) The child has no living parents . . . ."

General Statutes § 45a-718 (a) provides: "If a child is free for adoption as provided in section 45a-725, and no appointment of a statutory parent has been made under section 17a-112 or section 45a-717, the Court of Probate shall appoint a statutory parent for the child upon petition for appointment of a statutory parent by the guardian of the person of the child or a duly authorized officer of any child care facility or child-placing agency. The petition shall be filed in the court of probate for the district in which the petitioner or child resides or in the district in which the main office or any local office of the petitioner or the proposed statutory parent is located. The statutory parent shall be the Commissioner of Children and Families or a child-placing agency. Notice of the proceeding shall be sent to the guardian of the person, the child, if over the age of twelve, the applicant, the Commissioner of Children and Families and the proposed statutory parent by registered or certified mail or otherwise, at least ten days before the date of the hearing. Notice is not required for any party who files in court a written waiver of notice."

[7] An individual referred to in court papers as Susan G. and identified as Kelly S.' cousin also joined in the motion to intervene filed by the Vs, but she was denied intervenor status.

[8] See generally *In re Shamika F.*, 256 Conn. 383, 401 n.22, 773 A.2d 347 (2001) (fair preponderance of evidence is proper standard of proof for neglect petition because any deprivation of rights at that stage is reviewable and nonpermanent and warrants less exacting standard of proof than for petition to terminate parental rights).

[9] The court also granted motions for psychological evaluations of both the Ps and the Vs. In addition to the pending motions, upon an oral request by the Ps, the court increased their visitation schedule with Joshua S. from one hour every two weeks to one hour twice a week. No action was taken on the department's motion to be appointed statutory parent at that time.

mately denied the Ps' motion to dismiss, relying on *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 366, 488 A.2d 790 (1985), where this court determined that, once a child is adjudicated neglected, the Superior Court has exclusive jurisdiction over matters concerning guardianship.

Thereafter, a trial on the dispositional phase of the neglect proceeding was held between July 31, 2000, and August 8, 2000. The trial court named the Vs as Joshua S.' custodians and granted the department's motion to be appointed statutory parent for the purpose of facilitating his adoption by the Vs. The Ps appealed to the Appellate Court from that judgment. This court transferred this appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.[10]

I

We first consider whether the trial court improperly denied the Ps' motion to dismiss for lack of subject matter jurisdiction.[11] Specifically, the Ps claim that jurisdiction over the appointment of testamentary guardians

---

[10] General Statutes § 51-199 (c) provides: "The Supreme Court may transfer to itself a cause in the Appellate Court. Except for any matter brought pursuant to its original jurisdiction under section 2 of article sixteen of the amendments to the Constitution, the Supreme Court may transfer a cause or class of causes from itself, including any cause or class of causes pending on July 1, 1983, to the Appellate Court. The court to which a cause is transferred has jurisdiction."

Practice Book § 65-2 provides in relevant part: "After the filing of an appeal in the appellate court, but in no event after the case has been assigned for hearing, any party may move for transfer to the supreme court. The motion, addressed to the supreme court, shall specify, in accordance with provisions of Section 66-2, the reasons why the party believes that the supreme court should hear the appeal directly. A copy of the memorandum of decision of the trial court, if any, shall be attached to the motion. The filing of a motion for transfer shall not stay proceedings in the appellate court. . . ."

[11] Although the Ps raise this as their final claim, subject matter jurisdiction is a threshold matter that we must resolve in order to address their other claims.

is vested exclusively with the Probate Court pursuant to General Statutes § 45a-596. The department and the Vs claim, conversely, that § 46b-129, read in conjunction with our decision in *In re Juvenile Appeal (85-BC)*, supra, 195 Conn. 366, confers exclusive jurisdiction over Joshua S. on the Superior Court, because he was adjudicated as neglected. We agree with the department and the Vs and conclude that the Superior Court properly denied the Ps' motion to dismiss for lack of jurisdiction.

The following additional facts and procedural history are relevant to this claim. Immediately after Joshua S. arrived at the hospital during the early morning hours of June 11, 1999, the hospital and the East Hartford police department requested that the department intervene to address Joshua S.' needs, because he was critically injured. That day, the department filed with the Superior Court a neglect petition on behalf of Joshua S., alleging that he was suffering from serious physical injury and was in need of a legal guardian. The same day, the Superior Court granted the petition and ordered the department to assume temporary custody and care over Joshua S.

Also on June 11, 1999, the department learned of the existence of the reciprocal wills of Charles S. and Kelly S. naming the Ps as testamentary guardians, and it informed the Superior Court accordingly. The court was further made aware that Chad P. had been approached by the department but had indicated to the department that he and Sara P. did not wish to assume custody of Joshua S. On July 19, 1999, a contested hearing was held in Probate Court concerning the wills of Charles S. and Kelly S. The Probate Court ultimately admitted both wills to probate, but because of the pendency of the neglect petition in the Superior Court the Probate Court declined to address the issue of Joshua S.' guard-

ianship, despite the Ps having been named as testamentary guardians.

The Superior Court later affirmed the June 11 order of temporary custody, and on June 22, 1999, upon his discharge from the hospital, Joshua S. was placed in the temporary care and custody of the Vs. Subsequently, the Ps filed with the Superior Court a motion to dismiss the neglect petition, claiming that the existence of a valid will naming them as testamentary coguardians conferred sole jurisdiction on the Probate Court. The Superior Court denied the motion, concluding that it, rather than the Probate Court, had exclusive jurisdiction over the question of guardianship because a neglect petition had been filed. We agree with the Superior Court.

We begin by addressing the appropriate standard of review. "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Doe* v. *Roe*, 246 Conn. 652, 660, 717 A.2d 706 (1998).

The Ps rely solely on General Statutes (Rev. to 1999) § 45a-596 as the basis of their jurisdictional claim. General Statutes (Rev. to 1999) § 45a-596 (a) provides that "[t]he surviving parent[12] of any minor may by will appoint a person or persons as guardian or coguardians of the person of such minor, a guardian or coguardians of the estate or both. Such appointment shall not super-

---

[12] All parties stipulated that Charles S. predeceased Kelly S. Kelly S. was, therefore, the "surviving parent" for purposes of § 45a-596. This distinction is of no consequence to our resolution of this matter, however, because the wills were identical in all material respects, and, in particular, both named Chad P. and Sara P. as guardians of Joshua S.

sede the previous appointment of a guardian made by the court of probate having jurisdiction."[13]

The only Connecticut case construing § 45a-596 is the Appellate Court's decision in *Bristol* v. *Brundage*, 24 Conn. App. 402, 589 A.2d 1 (1991). That case, however, did not speak to the issue of jurisdiction. Rather, the Appellate Court in *Bristol* held only that "§ 45a-596 (a) should be interpreted as mandating the appointment of the sole surviving parent's testamentary choice of a guardian because it should be presumed that the best interests of the child are served by that appointment. This presumption, like that of [General Statutes] § 46b-56b, may be rebutted only by a showing that it would be detrimental to the child to permit the named testamentary guardian to serve as such." Id., 406. Consequently, neither *Bristol* nor § 45a-596 itself stand for the proposition urged by the Ps that the Probate Court, rather than the Superior Court, is vested with jurisdiction.

We do have guidance on this issue, however. Our case law instructs that when a neglect petition has been filed, the Superior Court has jurisdiction pursuant to § 46b-129. In *In re Juvenile Appeal (85-BC)*, supra, 195 Conn. 366, we determined that "[t]he language of § 46b-129, particularly that of subsection [j],[14] reveals that

[13] General Statutes (Rev. to 1999) § 45a-596 was amended after the Ps filed the motion to dismiss. This amendment, however, has no bearing on the issue presently before this court. See Public Acts 2000, No. 00-76, amending subsection (a) of General Statutes (Rev. to 1999) § 45a-596 to permit parental appointment of a guardian or coguardians of a minor child upon the death of the parents, by will or other writing attested to by at least two witnesses, and to provide in the case of two appointing documents that the latest effective appointment prevails. Unless otherwise noted, all references in this opinion to § 45a-596 are to that statute as revised to 1999.

[14] In *In re Juvenile Appeal (85-BC)*, supra, 195 Conn. 345 n.1, we analyzed § 46b-129 (d) as revised to 1983. Subsequently, this section was substantially revised by No. 98-241 of the 1998 Public Acts. This revision redesignated former subsection (d) as subsection (j). The spirit of this subsection was not significantly altered, however, and, therefore, the revision does not alter our analysis of this issue. In addition, No. 95-238 of the 1995 Public Acts

### the General Assembly contemplated a clear distinction

reduced the maximum period of commitment of a child to the commissioner of children and families from eighteen months to twelve months; technical changes were also made by No. 00-137 of the 2000 Public Acts.

General Statutes § 46b-129 (j) provides: "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the Commissioner of Children and Families for a maximum period of twelve months, unless such period is extended in accordance with the provisions of subsection (k) of this section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person or persons found to be suitable and worthy of such responsibility by the court. The court shall order specific steps which the parent must take to facilitate the return of the child or youth to the custody of such parent. The commissioner shall be the guardian of such child or youth for the duration of the commitment, provided the child or youth has not reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, provided such child or youth has not reached the age of twenty-one, by consent of such youth, or until another guardian has been legally appointed, and in like manner, upon such vesting of his care, such other public or private agency or individual shall be the guardian of such child or youth until he has reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, until such child or youth has reached the age of twenty-one years or until another guardian has been legally appointed. Said commissioner may place any child or youth so committed to him in a suitable foster home or in the home of a person related by blood to such child or youth or in a licensed child-caring institution or in the care and custody of any accredited, licensed or approved child-caring agency, within or without the state, provided a child shall not be placed outside the state except for good cause and unless the parents of such child are notified in advance of such placement and given an opportunity to be heard, or in a receiving home maintained and operated by the Commissioner of Children and Families. In placing such child or youth, said commissioner shall, if possible, select a home, agency, institution or person of like religious faith to that of a parent of such child or youth, if such faith is known or may be ascertained by reasonable inquiry, provided such home conforms to the standards of said commissioner and the commissioner shall, when placing siblings, if possible, place such children together. As an alternative to commitment, the court may place the child in the custody of the parent or guardian with protective supervision by the Commissioner of Children and Families subject to conditions established by the court."

between guardianships ordered by the Superior Court in accordance with that provision and those ordered by appointment of the Probate Court. Accordingly, we construe § 46b-129 [j] as conferring exclusive jurisdiction on the Superior Court to enter 'custody-guardianship orders' in those cases in which there is a 'finding and adjudging' by that court that the 'child or youth is uncared-for, neglected or dependent,' and this finding, moreover, must be the product of a neglect petition filed with the Superior Court pursuant to § 46b-129. This construction still allows effect to be given those provisions of our statutes that authorize the Probate Court in cases not brought under § 46b-129 to remove a parent as guardian and then to appoint a guardian of a minor under such statutes as General Statutes §§ 45-43a, 45-44, 45-44c, 45-45."[15] We conclude that, when the

[15] The Ps suggest that the department acted inappropriately in filing the neglect petition in such an expeditious manner. We note, however, that Joshua S. was critically injured and required immediate medical decisions to be made on his behalf. Indeed, had the department adopted a wait and see approach as is suggested by the Ps' argument, it arguably would have been derelict in its statutory duty to act swiftly in prosecuting petitions for neglect. See General Statutes § 17a-47, which provides that "[t]here shall be a legal division which shall consist of attorneys-at-law assigned to each regional office of the department, who shall be assistant attorneys general on the staff and under the direct supervision of the Attorney General. Said division shall diligently prosecute petitions of neglect giving priority to petitions which allege child abuse as the grounds of neglect. The Department of Children and Families shall cooperate with such attorneys in preparation of their cases and shall render such assistance to them as shall be necessary to protect the best interest of the child named in the petition." Accordingly, we conclude that in filing the neglect petition as soon as possible after the tragic events of June 10, 1999, the department was acting in an appropriate manner and in fulfillment of its responsibility as parens patriae. We previously have recognized the state's "continuing parens patriae interest . . . in the well being of children . . . ." *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318–19, 460 A.2d 1277 (1983). "[T]he continuing welfare of the child is a matter of legitimate state interest. *In re Juvenile Appeal (85-3)*, 3 Conn. App. 194, 198, 485 A.2d 1369, cert. denied, 196 Conn. 801, 491 A.2d 1105 (1985). . . . Accordingly, we conclude that the protection of children, with specific reference to the department, is a clear public policy of this state." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4,*

Superior Court has jurisdiction pursuant to § 46b-129, the existence of a will appointing a testamentary guardian does not deprive it of that jurisdiction. It is the province of the Superior Court, not the Probate Court, to determine the disposition of a neglected child.

The Ps assert nonetheless that "[t]he Superior Court lacked jurisdiction in this matter not because [Charles S. and Kelly S.] were deceased but because the issue to be decided in this case was whether the Ps were fit to be Joshua [S.'] guardians as anticipated by the testamentary guardianship provisions of the [parents'] [w]ills." The Ps misinterpret the issue. Here, the Superior Court had jurisdiction despite the fact that Charles S. and Kelly S. died testate. Although a Probate Court has primary jurisdiction over many issues concerning custody and guardianship, our decision in *In re Juvenile Appeal (85-BC)*, supra, 195 Conn. 344, makes clear that in cases where a neglect petition is filed pursuant to § 46b-129, as in this case, the Superior Court is vested with exclusive jurisdiction. "[T]he Probate Court does not possess jurisdiction to adjudicate custody-guardianship matters that arise under § 46b-129 [j]. We add that courts of probate are strictly statutory tribunals and, as such, they have only such powers as are expressly or implicitly conferred upon them by statute. *Potter* v. *Alcorn*, 140 Conn. 96, 100, 99 A.2d 97 (1953). . . . While it is true that some matters of guardianship are within probate jurisdiction, we point out that § 46b-129 concerns only 'any child or youth [who is adjudged] uncared-for, neglected or dependent' rather than all matters of guardianship. *Eason* v. *Welfare Commissioner*, 171 Conn. 630, 635, 370 A.2d 1082 (1976), cert. denied, 432 U.S. 907, 97 S. Ct. 2953, 53 L. Ed. 2d 1079 (1977)." *In re Juvenile Appeal (85-BC)*, supra, 366–67 n.18.

*Local 2663, AFL-CIO*, 59 Conn. App. 793, 799, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000).

The Ps also point out that none of the cases cited by the department and the Vs in support of their position that the Superior Court enjoys exclusive jurisdiction "are [w]ill cases involving testamentary guardianship." The Ps further allege that the Superior Court maintained jurisdiction over the action merely because the department "won the race to the courthouse." We disagree. In making this claim the Ps ignore the paramount factual distinction between this case and *Bristol* v. *Brundage*, supra, 24 Conn. App. 402, namely that in *Bristol*, there had been no neglect petition. The extreme and unusual circumstances in this case effectively vested exclusive jurisdiction over this matter with the Superior Court. The violent actions of Kelly S. created an emergency situation necessitating the department's filing of the neglect petition for the two critically injured and orphaned children. Had this matter been an unfortunate, but uncomplicated, situation wherein both parents had died and their wills were admitted to probate for settlement of their estates, including the determination of guardianship of an orphaned child, original subject matter jurisdiction would be vested in the Probate Court. See *Dunham* v. *Dunham*, 204 Conn. 303, 328, 528 A.2d 1123 (1987) (Probate Court has exclusive subject matter jurisdiction over matters involving validity of wills and settlement of estates); 1 W. Locke & P. Kohn, Connecticut Probate Practice (1951) § 39, pp. 70, 71.

Moreover, we note that, from a practical standpoint, the Ps' position that jurisdiction rested exclusively with the Probate Court merely because a will, or a statutorily equivalent writing,[16] naming a testamentary guardian exists would have an undesirable effect in that it would serve only to add a layer of delay to a time-sensitive matter that would ultimately be under Superior Court

---

[16] See General Statutes (Rev. to 2001) § 45a-596 (a) (parent may "by will or other writing signed by the parent and attested by at least two witnesses" appoint guardian).

jurisdiction. As a general matter, when a decision of the Probate Court is appealed to the Superior Court, a trial de novo is conducted. See *Bristol* v. *Brundage*, supra, 24 Conn. App. 407, citing *Prince* v. *Sheffield*, 158 Conn. 286, 294, 259 A.2d 621 (1969) ("[i]n an appeal from probate, the trial court exercises the right to make an independent and de novo determination of the issue involved, without regard to the result reached by the Probate Court"). When a neglect petition has been filed, this additional step would directly contravene a child's need for quick resolution and a permanent placement. We previously have recognized the deleterious effects of prolonged temporary placement. *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 292, 455 A.2d 1313 (1983); see also *In re Shane P.*, 58 Conn. App. 244, 261, 754 A.2d 169 (2000).

Accordingly, we recognize that the state had a vital interest in expediting the process. The Superior Court in this case recognized the time-sensitive nature of this matter and properly denied the Ps' motion to dismiss.

II

We next address the Ps' claim that the trial court improperly concluded that the department and the Vs had rebutted the presumption that Joshua S.' best interests are served by the appointment of testamentary guardians. Specifically, the Ps argue that the trial court improperly concluded that the presumption was rebutted because that court found that it would be detrimental to Joshua S. to permit the appointment of the testamentary guardians, despite having found the testamentary guardians to be fit, suitable and worthy custodians for Joshua S. We disagree.

We begin by setting out the appropriate standard of review. This claim requires us to determine the legal standard for rebutting the presumption that it is in the best interests of the child to appoint the named testa-

mentary guardian to serve as such. "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . *Unkelbach* v. *McNary*, [244 Conn. 350, 357, 710 A.2d 717 (1998)]; *Jenkins* v. *Jenkins*, [243 Conn. 584, 588, 704 A.2d 231 (1998)]." (Internal quotation marks omitted.) *Marrocco* v. *Giardino*, 255 Conn. 617, 624, 767 A.2d 720 (2001).

## A

### Applicable Presumption

The Ps cite *Bristol* v. *Brundage*, supra, 24 Conn. App. 402, in support of their argument that there is a presumption that it is in a child's best interests to allow a named testamentary guardian to serve as such, and that this presumption may be rebutted only by demonstrating that this would be detrimental to the child. The Ps claim further that *Bristol* dictates that detriment is shown only by demonstrating that the testamentary guardians are not fit to serve as such. While we agree with the Ps that this presumption may be rebutted only by showing that it would be detrimental to the child to permit the named testamentary guardian to serve as such, we disagree with their narrow interpretation of how detriment is demonstrated. We conclude, moreover, that the trial court properly determined that the presumption was rebutted.

Some background is helpful to our discussion. Section 45a-596 (a) provides a testamentary vehicle for Connecticut parents to choose guardians for their children. In *Bristol*, the court considered "whether a Court of Probate or [the Superior Court] has the power to appoint, as a guardian of a minor child, a person other than the person designated in the will of the child's sole surviving parent, in the absence of evidence that

the testamentary guardian would not be a suitable guardian." Id., 403.

A brief recitation of the relevant facts in *Bristol* is warranted. "Candace Keeler died testate, leaving a minor son. The will named the plaintiff, her brother, Clayton Bristol, as the guardian of the person and of the estate of her son. The Probate Court of Torrington appointed Bristol and the defendant, Winifred Brundage, the child's grandmother, as coguardians of the person of the child. . . . The plaintiff appealed from the Probate Court decree to the Superior Court, claiming that the Probate Court had exceeded its authority as granted by General Statutes § [45a-596] when it appointed Brundage as a coguardian of the person of the minor child.

"The trial court construed the statute as allowing the appointment by the Probate Court . . . [and] dismissed the appeal without any discussion or finding as to the qualifications of the particular guardians or the best interests of the child." Id., 403–404. The plaintiff appealed to the Appellate Court, which reversed the trial court's judgment dismissing the appeal from probate and determined that the defendant should not have been appointed as coguardian. Id., 408.

The Appellate Court concluded that "[t]he plaintiff should have had an initial advantage over all other potential guardians because he was named in the will as the guardian. See *Evans* v. *Santoro*, 6 Conn. App. 707, 711 n.3, 507 A.2d 1007 (1986). Phrased differently, the plaintiff should have had the benefit of a presumption that he should be named the sole guardian of the child." *Bristol* v. *Brundage*, supra, 24 Conn. App. 407.

In construing § 45a-596, the court in *Bristol* appropriately likened the presumption arising under § 45a-596 to that arising under General Statutes § 46b-56b, which creates a rebuttable presumption in favor of a parent

in a custody dispute between a parent and nonparent. Id., 406. In *Bristol*, the court stated further that the presumption arising under § 46b-56b may be rebutted by showing that it would be detrimental to the child to be in the custody of the parent.[17] The court stated in dicta, however, that the presumption was not rebutted because there was no evidence that the plaintiff "was not a fit guardian." Id., 407. Although we agree that evidence that a named testamentary guardian is not fit may demonstrate detriment and, therefore, rebut the presumption that it is in the best interests of the child to allow a testamentary guardian to serve, that is not

---

[17] General Statutes § 46b-56b provides: "In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody." Subsequent to the Appellate Court's decision in *Bristol*, we decided *Doe* v. *Doe*, 244 Conn. 403, 710 A.2d 1297 (1998), which presented a unique and complex factual situation centering on a custody dispute in a dissolution matter where the child of the parties to the dissolution was born of a surrogate mother who was married to another individual at the time of the surrogacy arrangement. The defendant in the dissolution was the biological father of the child. Id., 405. The plaintiff, the child's putative mother, never formally adopted the child; id.; nor were the parental rights of the surrogate ever terminated. Id., 412. In addition, both the plaintiff and the defendant participated in an elaborate ruse to present the plaintiff as the child's birth mother. Id., 411. We stated in *Doe* that "[t]he presumption, [arising under § 46b-56b] which is one of public policy, places upon the nonparent the burden of proving sufficient facts to put the presumed fact [that it is in the best interest of the child to be in the custody of the parent] into issue. . . . *Garrett's Appeal from Probate*, 44 Conn. Sup. 169, 183, 677 A.2d 1000 (1994), aff'd, 237 Conn. 233, 676 A.2d 394 (1996). . . . So long as due regard is given to the presumption, however, [t]he best interests standard remains the ultimate basis of a court's custody decision. . . . *Garrett's Appeal from Probate*, supra, 183; *Hao Thi Popp* v. *Lucas*, [182 Conn. 545, 551, 438 A.2d 755 (1980)]." (Citations omitted; internal quotation marks omitted.) *Doe* v. *Doe*, supra, 455. In light of our recent decisions concerning third party visitation, however; *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002); *Crockett* v. *Pastore*, 259 Conn. 240, 789 A.2d 453 (2002); we now question the vitality of the standard as set out in *Doe* by which to rebut the presumption favoring a parent over a nonparent in a custody dispute.

the *only* type of evidence that would rebut this presumption.

In claiming that the trial court was required to find them unfit in order to overcome the presumption that it is in the child's best interests for the testamentary guardians to serve as such, the Ps urge us to view them as having received the baton of constitutional protections enjoyed by parents. In support of their claim, the Ps cite the long recognized fundamental liberty interest of parents in the care, custody and control of their children. See *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). The Ps' reliance on this line of cases, however, is misplaced. There is a distinction between the situation in *Troxel*, where the presumably fit parent is still alive, and the situation now facing the court. Accordingly, we reject this claim.

In *Troxel*, the plaintiffs, the paternal grandparents, sought visitation with their two granddaughters in excess of what the defendant, the children's mother, had allowed. *Troxel* v. *Granville*, supra, 530 U.S. 60–61. The defendant and the plaintiffs' son, the father of the children, had never married. Id., 60. After the plaintiffs' son and the defendant ended their relationship, the plaintiffs' son committed suicide. Id. The defendant married another man, who formally adopted the children. Id., 61–62.

The Washington statute under review in *Troxel* allowed any person to petition for visitation rights at any time and authorized the Washington state Superior Courts to grant such rights whenever visitation may serve in the child's best interests. Id., 60. The United

States Supreme Court affirmed the judgment of the Washington Supreme Court, holding that the statute, as applied in that case, violated the due process clause of the fourteenth amendment to the United States constitution, because it was an "infringement on [the defendant's] fundamental right to make decisions concerning the care, custody, and control of her two daughters." Id., 66, 72. In support of this determination, the court reasoned that Washington's "breathtakingly broad" statute permitted a decision concerning visitation made by a fit custodial parent to be overruled on the basis of a Superior Court judge's determination that visitation with a third party would be in the child's best interests. Id., 67.

In light of the United States Supreme Court's decision in *Troxel*, we recently addressed a similar question concerning a nonparent petitioning for visitation in *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002), and in *Crockett* v. *Pastore*, 259 Conn. 240, 789 A.2d 453 (2002). Relying on *Troxel*, we held in these cases that the protected fundamental right of a parent to make child rearing decisions mandates that where a third party seeks visitation, that third party must allege and prove, by clear and convincing evidence, a relationship with the child that is similar in nature to a parent-child relationship, and that denial of the visitation would cause real and significant harm to the child. *Roth* v. *Weston*, supra, 234–35; *Crockett* v. *Pastore*, supra, 246.

In situations such as in *Troxel*, *Roth* and *Crockett*, where a presumably fit parent is alive, the constitutionally protected interest is that of the ongoing parent-child relationship. "[A] parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68

L. Ed. 2d 640 (1981), quoting *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). "Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' [*Boddie* v. *Connecticut*, 401 U.S. 371, 376, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971)], rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 116, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996); see also *Meyer* v. *Nebraska,* supra, 262 U.S. 390 (right of parent to establish home, bring up children and control child's education is liberty guaranteed by fourteenth amendment).

All of the foregoing cases speak to a liberty right that has its basis in an ongoing relationship between parent and child. In this case, however, this special relationship no longer exists; what remains is a predeath statement by the parents of strong preference for the future regarding who should be guardians for their children. The Ps do not cite and, indeed, we have not discovered, any authority to support the proposition that this fundamental liberty interest of parents survives the death of the parents, much less that it may be passed to testamentary guardians who have had no previous relationship with the child, other than as neighbors. In the case before us, because this special parent-child relationship no longer exists, this constitutionally protected interest, likewise, no longer exists. Therefore, we are not required to give the same deference to a predeath statement of preference as we would were this a decision concerning a child made by a living parent.

Moreover, we conclude that to recognize the passing of constitutional protections enjoyed by parents to testamentary guardians would effectively preclude the court from considering the best interests of the child. The sole test would be whether the testamentary guard-

ians were fit to serve with no consideration accorded to the needs of the child. While, at first blush, this may seem to guarantee that the parents' testamentary wishes concerning guardianship are effectuated, and, there-fore, the child's best interests are presumably met, this bright line scenario ignores the realities of everyday life and the complexities of interpersonal relationships.

Although we recognize the strong public policy in favor of encouraging parents to make testamentary selections in the first instance,[18] we also acknowledge the fluid nature of interpersonal relationships, as well as the infrequency with which a will is reviewed after its execution. If the fitness of a testamentary guardian was the sole test to demonstrate detriment, a court would have to blind itself to any other considerations concerning the child. For example, it does not require great imagination to envision a situation wherein cir-cumstances arose between the testator and testamen-tary guardian between the time of a will's execution and the death of the testator that could have a negative bearing on whether the best interests of the child would be served by granting custody to the testamentary guardian. Accordingly, we conclude that a presumption exists favoring a testamentary guardian named under § 45a-596 and it is rebuttable by demonstrating, by a fair preponderance of the evidence, that it would be detrimental to the child to permit the testamentary guardian to serve as such. See *Bristol* v. *Brundage*,

---

[18] We note that David L. Hemond, chief attorney for the Connecticut law revision commission, provided testimony on behalf of the commission expressing its support of the revision of § 45a-596 to allow appointment of a guardian by a nontestamentary instrument, stating that "[a]llowing appointment in a nontestamentary instrument will provide a significant convenience to parents dealing with the difficult issue of ensuring that a proper guardian is appointed to care for their children. The proposal also follows the lead of [Uniform Probate Code § 5-202] in allowing parents to make such a designation of guardian while they are both living." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 2000 Sess., p. 2092.

supra, 24 Conn. App. 406; see also *Abington Ltd. Partnership* v. *Heublein*, 257 Conn. 570, 586–87 n.29, 778 A.2d 885 (2001) (preponderance of evidence is standard of proof applicable to vast majority of factual disputes in civil cases); *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, 255 Conn. 800, 825, 770 A.2d 14 (2001) (in civil litigation, normal burden of persuasion is preponderance of evidence); *Clark* v. *Drska*, 1 Conn. App. 481, 485–86, 473 A.2d 325 (1984) (burden of proof in ordinary civil case is common preponderance of evidence standard). We conclude further that detriment may be shown, not just by demonstrating unfitness of the testamentary guardian, but by demonstrating considerations that would be damaging, injurious or harmful to the child.[19] We conclude further that once the presumption is rebutted, the best interests of the child remains as the determinative factor.

B

Application of the Burden of Proof

Having determined the appropriate standard for rebutting the presumption arising under § 45a-596, we now must address whether the trial court properly determined that the presumption was, in fact, rebutted. We conclude that the facts set out in its memorandum of decision support the trial court's conclusion that the presumption was rebutted, thereby leaving the child's best interests as the determinative factor in deciding custody.

The following facts are relevant to our discussion of this issue. At trial, testimony was elicited that Chad P., a

---

[19] "It is well established that, when determining the meaning of a word, 'it is appropriate to look to the common understanding of the term as expressed in a dictionary.' *State* v. *Indrisano*, 228 Conn. 795, 809, 640 A.2d 986 (1994)." *State* v. *Spillane*, 255 Conn. 746, 755, 770 A.2d 898 (2001). "Detriment" is defined as "damage; injury; harm." Webster's New World Dictionary (2d Ed.).

testamentary guardian, in response to the department's inquiries, had, on more than one occasion, declined to assume guardianship of Joshua S., despite the fact that he had indicated to Joshua S.' parent that he would do so.[20] As a result, Joshua S. was placed with the Vs. We emphasize that we in no way intend to minimize the psychological trauma suffered by the Ps as a result of their participation in the events of June 10, 1999. Nor do we suggest that it was in any way improper for the Ps to decline guardianship. We do conclude, however, that the fact that the Ps suffered such trauma, and that it affected them so significantly that they felt that they could not assume guardianship of Joshua S., demonstrates, by a fair preponderance of the evidence, that it would be damaging, injurious or harmful and, therefore, detrimental to Joshua S. to be placed with the Ps, thereby rebutting the presumption favoring the testamentary guardians.[21]

On the basis of the foregoing facts, we conclude that the department and the Vs demonstrated by a fair preponderance of the evidence that it would be detrimental to Joshua S. for him to be placed with the testamentary guardians and that those facts support the trial court's determination that the presumption had been rebutted. Having determined that the presumption has been rebutted, we must now address the issue of Joshua S.' placement by utilizing the best interests of the child standard.

[20] Chad P. disputed this assertion and testified that he never definitively declined to accept guardianship, claiming, rather, that he was ambivalent about doing so. Because we conclude, however, that immediate decisions regarding Joshua S.' well-being had to be made, it makes no difference, for our purposes, whether Chad P. had specifically declined guardianship or was merely ambivalent about the prospect.

[21] We make this determination irrespective of any possible misconduct by the department. We will address the issue of departmental misconduct in part IV of this opinion.

## C

### Best Interests Analysis

The Ps claim specifically that the trial court improperly vested the care and personal custody of Joshua S. with the Vs on the sole basis of the bond that existed between the Vs and Joshua S., even though that bond was allowed to form and solidify solely as a result of the misconduct and improper actions of the department. We determine that, in asserting this claim, the Ps are essentially making a best interests argument. We disagree with the Ps' claim.

We conclude that the trial court did not abuse its discretion in concluding that it was in Joshua S.' best interests to grant custody to the Vs. See *Schult* v. *Schult*, 241 Conn. 767, 777–78, 699 A.2d 134 (1997) (trial court vested with broad discretion to determine what is in child's best interests). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . The trial court is vested with broad discretion in determining what is in the child's best interests." (Citation omitted.) Id., 777.

Practice Book § 33-5 provides in relevant part that "[t]he judicial authority may admit into evidence any testimony relevant and material to the issue of the disposition, including events occurring through the close of the evidentiary hearing . . . ." Therefore, even if the department's alleged mishandling of this case eliminated the Ps from consideration in its early stages, resulting in Joshua S.' temporary placement with the Vs, it was proper for the trial court, in making its ultimate custody determination, to consider that placement. The trial court appropriately could consider any evidence or events that occurred through the close of trial. See *In re Sheena I.*, 63 Conn. App. 713, 721, 778 A.2d 997 (2001). Indeed, "the [trial] court was bound to consider

the child's *present* best interests and not what would have been in [his] best interests at some previous time." (Emphasis in original.) *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 664, 420 A.2d 875 (1979).

The record reveals a number of factors that support the trial court's ultimate determination granting custody to the Vs. The court-appointed psychologist, Anne Phillips, identified multiple factors that weighed in favor of granting the Vs custody of Joshua S., focusing specifically on the relationship with Joshua S.' extended family, the ability and inclination of the parties to foster a relationship between Joshua S. and his sister, the parties' views on corporal punishment and the parties' differing attitudes toward mental health treatment. We will address these factors in turn.

Testimony was presented at trial that the Vs considered themselves to be part of Joshua S.' extended family of origin. Aldo V. and Kelly S. had known each other since high school and maintained a close, "sibling-like" relationship thereafter. In addition, until her death, Kelly S. enjoyed a very close relationship with Aldo V.'s parents.

Testimony was also presented that placement with the Vs would better facilitate the continuation of Joshua S.' relationship with his sister, Jessica M., who now lives with her biological father in Minnesota. Jessica M.'s father maintained a good relationship with the Vs but had no contact with the Ps. Phillips testified that contact with his sister would be important to Joshua S. "in order for him in the long run to make . . . some kind of sense of his earlier experiences." In addition, the Ps candidly related to Phillips that Jessica M.'s significant visible scarring and ability to verbalize her memories of the tragic event would be difficult for them.

Another important consideration that favored the Vs, and militated against the Ps, was the Ps' admitted use

of corporal punishment, via a rod of correction, as an appropriate disciplinary tool on their own children.[22] The Vs, on the other hand, are opposed to corporal punishment. The significance of this issue is two-fold.

First, as the trial court correctly pointed out, the regulations of the department prohibit foster and prospective adoptive parents from using corporal punishment.[23] Sara P. testified, however, that there was a possibility that she would use corporal punishment on Joshua S.

Second, Phillips testified that while the Ps' use of corporal punishment on their own children may be both effective and nontraumatic, as to Joshua S., in particular, the use of corporal punishment "is a particularly risky venture." In view of what Joshua S. already had endured, this could be considered a telling factor.

An additional factor weighing in favor of granting custody to the Vs was their willingness to obtain traditional psychological assistance for Joshua S., if necessary. The Ps expressed reluctance to do so, instead favoring pastoral counseling and congregational support for mental health issues. The trial court found this to be an important factor, because additional testimony indicated that Joshua S. has many mental health risk factors, including a genetic predisposition to depression.

---

[22] Testimony was presented that the Ps believed corporal punishment was a guideline provided by their religious teachings for raising children. We note that there is no evidence that the Ps ever harmed their own children through the use of corporal punishment. Indeed, the trial court found that "the evidence established that the Ps had used corporal punishment in a thoughtful, constructive and sensitive way."

[23] Section 17a-145-151 (c) of the Regulations of Connecticut State Agencies provides: "Discipline shall be appropriate to the child's age and level of development. Foster and prospective adoptive parents shall not use physically or verbally abusive, neglectful, humiliating, frightening or corporal punishment, including but not limited to spanking, cursing or threats."

In addition to the foregoing, the trial court credited Phillips' testimony and found that Joshua S. was closely bonded with the Vs and that removing him from their home would create a significant risk that he would develop reactive attachment disorder[24] or some other psychological difficulty. Furthermore, Phillips testified that Joshua S. is the "psychological son" of the Vs and that his relationship with the Vs is that of a parent-child relationship. In contrast, according to Phillips, although the Ps articulated "a sense of integrity and honor and commitment in carrying out their agreement with [Charles S. and Kelly S.], and a sense of . . . compassion in taking in an orphaned child . . . [they do not] articulate an emotional connection to him."

Accordingly, we disagree with the Ps' statement that the trial court vested care and custody of Joshua S. in the Vs "on the *sole* basis" of the bonding between Joshua S. and the Vs. (Emphasis added.) There was ample testimony presented at trial, unrelated to the bonding

---

[24] "The essential feature of Reactive Attachment Disorder is markedly disturbed and developmentally inappropriate social relatedness in most contexts that begins before age 5 years and is associated with grossly pathological care (Criterion A). There are two types of presentations. In the Inhibited Type, the child persistently fails to initiate and to respond to most social interactions in a developmentally appropriate way. The child shows a pattern of excessively inhibited, hypervigilant, or highly ambivalent responses (e.g., frozen watchfulness, resistance to comfort, or a mixture of approach and avoidance) (Criterion A1). In the Disinhibited Type, there is a pattern of diffuse attachments. The child exhibits indiscriminate sociability or a lack of selectivity in the choice of attachment figures (Criterion A2). The disturbance is not accounted for solely by developmental delay (e.g., as in Mental Retardation) and does not meet criteria for Pervasive Developmental Disorder (Criterion B). By definition, the condition is associated with grossly pathological care that may take the form of . . . repeated changes of primary caregiver that prevent formation of stable attachments (e.g., frequent changes in foster care) (Criterion C3). The pathological care is presumed to be responsible for the disturbed social relatedness (Criterion D)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994), Reactive Attachment Disorder of Infancy or Early Childhood § 313.89, p.116.

issue, to support the trial court's custody determination. Thus, any misconduct or improper actions by the department in its handling of this case do not compel a contrary conclusion. On the basis of the foregoing, we conclude that the trial court did not abuse its discretion in determining that it was in Joshua S.' best interests to be placed in the custody of the Vs.

### III

The Ps claim next that the trial court improperly concluded that it, rather than the Probate Court, had authority to appoint a statutory parent for Joshua S. We disagree.

Our analysis of this issue is guided by well established legal principles. "Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *State* v. *Murray*, 254 Conn. 472, 487–88, 757 A.2d 578 (2000).

"Chapter 801a of the General Statutes outlines the jurisdiction and powers of probate courts. In addition to various powers regarding wills and estates, probate courts are provided with the authority to 'make any lawful orders or decrees to carry into effect the power and jurisdiction conferred upon them by the laws of this state.' General Statutes (Rev. to 1995) § 45a-98 (a) (6). . . . Other sections of the General Statutes also address the jurisdiction of probate courts." *In re Micheala Lee R.*, 253 Conn. 570, 581, 756 A.2d 214 (2000). We note, however, that no section of the General Stat-

utes confers on the Probate Court exclusive jurisdiction over appointing a statutory parent.[25]

We first consider the scope of the Probate Court's jurisdiction. "It is well established that courts of probate are statutory tribunals that have no common-law jurisdiction. *In re Juvenile Appeal (85-BC)*, supra, [195 Conn. 366 n.18]; *Palmer* v. *Hartford National Bank & Trust Co.*, 160 Conn. 415, 428, 279 A.2d 726 (1971); *Brownell* v. *Union & New Haven Trust Co.*, 143 Conn. 662, 665, 124 A.2d 901 (1956); *Killen* v. *Klebanoff*, 140 Conn. 111, 115, 98 A.2d 520 (1953); *Potter* v. *Alcorn*, 140 Conn. 96, 100, 99 A.2d 97 (1953). Accordingly, [courts of probate] can exercise only such powers as are conferred on them by statute. . . . They have jurisdiction only when the facts exist on which the legislature has conditioned the exercise of their power. . . [A] court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation. . . Ordinarily, therefore, whether a Probate Court has jurisdiction to enter a given order depends upon the interpretation of a statute." (Citations omitted; internal quotation marks omitted.) *In re Michaela Lee R.*, supra, 253 Conn. 580–81.

"Our legislature has consistently drafted legislation to state expressly when a court has exclusive jurisdiction.

---

[25] General Statutes § 17a-93 (f) defines statutory parent as follows: " 'Statutory parent' means the Commissioner of Children and Families or that child-placing agency appointed by the court for the purpose of giving a minor child or minor children in adoption . . . ."

General Statutes § 45a-718 (a) requires a Probate Court to appoint a statutory parent upon petition for it to do so, if the child is free for adoption under § 45a-725 and no appointment of a statutory parent has been made pursuant to General Statutes § 17a-112. This jurisdiction is not, however, exclusive, because § 17a-112 (m) provides in relevant part that "[t]he Superior Court may appoint a statutory parent at any time after it has terminated parental rights if the petitioner so requests."

See, e.g., General Statutes § 46b-42 (granting Superior Court exclusive jurisdiction over all complaints seeking dissolution of marriage, decree of annulment or legal separation); General Statutes § 46b-212h (a) (granting family support magistrate division or Superior Court exclusive jurisdiction over child support orders); General Statutes § 52-12 (granting Superior Court exclusive jurisdiction over sale of certain real property)." *Sender* v. *Sender*, 56 Conn. App. 492, 498, 743 A.2d 1149 (2000).

In contrast to courts of probate, "[t]he Superior Court of this state as a court of law is a court of general jurisdiction. It has jurisdiction of all matters expressly committed to it and of all others cognizable by any law court of which the exclusive jurisdiction is not given to some other court. The fact that no other court has exclusive jurisdiction in any matter is sufficient to give the Superior Court jurisdiction over that matter." (Internal quotation marks omitted.) *LaBella* v. *LaBella*, 134 Conn. 312, 316, 57 A.2d 627 (1948); see General Statutes § 51-164s.[26]

In part I of this opinion, we held that original jurisdiction over the appointment of a guardian in this matter was conferred upon the Superior Court because this case had been initiated as a neglect petition. The appointment of a statutory parent in this case was ancillary to that neglect proceeding. Therefore, in the absence of legislation bestowing upon the Probate Courts exclusive jurisdiction over the appointment of a statutory parent, jurisdiction over the appointment of a statutory parent necessarily was conferred upon the Superior Court because it was ancillary to the original

---

[26] General Statutes § 51-164s provides: "The Superior Court shall be the sole court of original jurisdiction for all causes of action, except such actions over which the courts of probate have original jurisdiction, as provided by statute. All jurisdiction heretofore conferred upon and exercised by the Court of Common Pleas and the Juvenile Court prior to July 1, 1978 shall be transferred to the Superior Court on July 1, 1978."

cause of action. See *Sender* v. *Sender*, supra, 56 Conn. App. 499 (dispute over custodial accounting that arose in context of dissolution action over which Superior Court had exclusive jurisdiction properly within jurisdiction of Superior Court).

Moreover, in *Hall* v. *Dichello Distributors, Inc.*, 6 Conn. App. 530, 535, 506 A.2d 1054, cert. denied, 200 Conn. 807, 512 A.2d 230 (1986), the Appellate Court addressed the jurisdictional limitations of the Probate Court and recognized that there are three types of actions in which the Superior Court does not exercise original jurisdiction: those involving the "custody of a child not the issue of the marriage involved in a divorce, settlement of an executor's or administrator's account, and the question of due execution of a will." The cause of action in this case does not fit into any of the three jurisdictional categories articulated in *Hall*. See *Sender* v. *Sender*, supra, 56 Conn. App. 498.

We conclude, therefore, that the Superior Court had jurisdiction to appoint a statutory parent when petitioned to do so, because the legislature has not bestowed exclusive jurisdiction over this issue upon the Probate Courts. Furthermore, the appointment of a statutory parent in this case was merely ancillary to the neglect proceeding, which, we previously have determined, was within the jurisdiction of the Superior Court.

## IV

The Ps claim finally that the trial court improperly concluded that the department should be appointed statutory parent of Joshua S. after determining that the department had engaged in misconduct. We disagree.

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made

findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . *DeSena* v. *Waterbury*, 249 Conn. 63, 72–73, 731 A.2d 733 (1999)." (Internal quotation marks omitted.) *Union Carbide Corp.* v. *Danbury*, 257 Conn. 865, 870–71, 778 A.2d 204 (2001).

The Ps claim specifically that the trial court, in its memorandum of decision, "found that [the department] engaged in possible religious discrimination, evinced an ignorance of applicable law, engaged in the intentional destruction of documents under subpoena and mishandled this case." We will address these assertions in turn.

We first clarify that, contrary to the Ps' claim, the trial court did not find that the department had engaged in religious discrimination. In discussing the department's early elimination of the Ps from consideration for guardianship, the trial court stated: "[The department] received information shortly after June 10 that the Truth Baptist Church had counseled Kelly [S.] not to use medicine despite her serious mental illness and that the Church in several other respects was a 'cult.' While some of these reports may have generated legitimate inquiries into whether any practices of the church or of Chad P., as assistant pastor of the church, might harm Joshua [S.], [the department] disclaimed reliance on the Ps' religion per se as a basis for rejecting their guardianship. *Assuming the sincerity of [the department's] position, it was obviously correct since discrimination against prospective foster parents based solely on religion would be completely impermissible.*" (Emphasis added.) On the basis of this statement, we conclude that the trial court credited the testimony of the department and did not find, contrary to the Ps' claim, that the department had engaged in religious discrimination.

We turn next to the Ps' claims that the department evinced an ignorance of applicable law, engaged in the

intentional destruction of documents under subpoena and mishandled this case. Specifically, the Ps claim that a department employee intentionally had destroyed handwritten notes from telephone conversations with Chad P. and had "ignored" the wills of Charles S. and Kelly S. Although we emphasize that we do not condone the specific instances of misconduct perpetrated by the department in its handling of this case, it does not alter the resolution of this issue.

"A statutory parent is defined as 'the [commissioner] or the child-placing agency appointed by the court for the purpose of giving a minor child . . . in adoption . . . .' General Statutes § 45a-707 (7). A child-placing agency, in turn, is defined as 'any agency within or without the state of Connecticut licensed or approved by the Commissioner . . . .' General Statutes § 45a-707 (3) . . . ." *Nancy G.* v. *Dept. of Children & Families,* 248 Conn. 672, 684, 733 A.2d 136 (1999).

General Statutes § 45a-718 (a) provides in relevant part: "If a child is free for adoption as provided in section 45a-725,[27] and no appointment of a statutory parent has been made under section 17a-112 or section 45a-717, the Court of Probate[28] shall appoint a statutory parent for the child upon petition for appointment of a statutory parent by the guardian of the person of the child or a duly authorized officer of any child care facility or child-placing agency. . . . *The statutory parent shall be the Commissioner of Children and Families or a child-placing agency. . . .*" (Emphasis added.)

---

[27] General Statutes § 45a-725 provides in relevant part: "A minor child shall be considered free for adoption and the Court of Probate may grant an application for the appointment of a statutory parent if any of the following have occurred: (a) The child has no living parents . . . ."

[28] See part III of this opinion wherein we concluded that the Superior Court has jurisdiction over the appointment of a statutory parent when petitioned to do so, as the legislature has not bestowed exclusive jurisdiction over this issue on the Probate Courts.

Here, the department, acting in its capacity as Joshua S.' temporary guardian, filed its petition seeking appointment of itself as statutory parent. Because § 45a-718 is directory in nature, and because the department petitioned to have itself, as opposed to some other child-placing agency, appointed as statutory parent, the trial court properly appointed the department as statutory parent; indeed, it could not properly have appointed any other entity.

In sum, the trial court's findings of fact regarding alleged misconduct by the department are supported by the record. Because, however, the trial court was statutorily directed to make such an appointment pursuant to § 45a-718, we conclude that the trial court acted properly in appointing the department as Joshua S.' statutory parent, regardless of any departmental misconduct.

The judgment is affirmed.

In this opinion the other justices concurred.