ALLSTATE INSURANCE COMPANY *v.* STEPHEN C. BARRON, ADMINISTRATOR (ESTATE OF KELLY S.), ET AL.
(SC 17111)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued February 9—officially released June 1, 2004

*Kathryn Calibey*, with whom were *Karen K. Clark* and, on the brief, *Richard J. Kenny*, for the appellant (defendant Frank A. Leone, administrator of the estates of Charles S. et al.).

*Christopher M. Vossler*, with whom were *Alexandria L. Voccio* and, on the brief, *Philip T. Newbury, Jr.*, for the appellee (plaintiff).

*Opinion*

SULLIVAN, C. J. The dispositive issue in this appeal is whether the plaintiff, Allstate Insurance Company, had a duty to indemnify its insured under a homeowners' insurance policy issued by the plaintiff to Charles S. and Kelly S. The plaintiff filed this declaratory judgment action against the defendants[1] seeking a determination that it had no such duty. It then filed a motion for summary judgment claiming, inter alia, that there was no genuine issue of material fact as to whether the insured's conduct was intentional within the meaning of the policy's intentional conduct exclusion clause. The

---

[1] The defendants are Stephen C. Barron, administrator of the estate of Kelly S., Frank A. Leone, administrator of the estate of Charles S., and Frank A. Leone, administrator of the estates of Jennifer S. and Jonah S. The plaintiff's declaratory judgment complaint originally named as a defendant Jessica M., appearing through her next friend, Frank Phillippe. The plaintiff has withdrawn its complaint against that defendant.

trial court granted the motion and rendered summary judgment in favor of the plaintiff. The defendants then filed this appeal claiming that the trial court improperly determined that there was no genuine issue of material fact as to the insured's state of mind.[2] We agree with the defendants and, accordingly, reverse the judgment of the trial court.

The horrific events underlying this case were set forth by this court in *In re Joshua S.*, 260 Conn. 182, 796 A.2d 1141 (2002). "During the early morning hours of June 10, 1999, Kelly S., a woman with a long history of psychiatric problems, stabbed to death her husband, Charles S., in the bedroom of their East Hartford home. Awakened by the screams of Charles S., Kelly S.' then nine year old daughter, Jessica M., ran into the same bedroom, where Kelly S. then began to stab her repeatedly. Jessica M. ran from the bedroom and down the hall, while being pursued by Kelly S. Kelly S. then doused herself, Jessica M. and a bedroom with gasoline, and set the house on fire. Kelly S. . . . as well as two of [her and Charles S.' children] Jennifer S., nearly three years old, and Jonah S., one and one-half years old, died in the conflagration. Their son, Joshua S., then two months old, survived." Id., 185–86. Jessica M. fled from the house and also survived. Id., 186.

Separate wrongful death actions against the estate of Kelly S. (Kelly) were filed by Frank A. Leone, the administrator of the estates of Jennifer S. and Jonah S. and Frank A. Leone, the administrator of the estate of Charles S. The complaints in both actions alleged that the deaths had resulted from Kelly's negligent or reckless conduct. They also alleged that her mental capacity was severely impaired at the time of the incident. On

[2] The defendants appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

October 30, 2001, the plaintiff, which had issued a home-owner's insurance policy to Kelly and Charles S., initiated this action seeking a declaratory judgment that it had no duty to defend[3] or to indemnify Kelly's estate because: (1) the incident was not an "occurrence" within the meaning of the policy; and (2) the policy's exclusions relating to intentional or criminal acts applied to Kelly's conduct.[4] The defendants filed counterclaims seeking a declaratory judgment that the plaintiff had a duty to defend and indemnify Kelly's estate for their claims.

On April 24, 2002, the plaintiff filed a motion for summary judgment in which it claimed, inter alia, that there was no genuine issue of material fact that Kelly's conduct fell within the policy exclusion barring coverage for bodily injury that was intended or that reasonably could have been expected to result from the intentional or criminal acts or omissions of the insured. In support of its motion, the plaintiff relied on the allegations in the defendants' complaints in the underlying cases describing Kelly's conduct on the morning of June 10, 1999. The plaintiff also attached to its motion a copy of the insurance policy and the official death certificates from the office of the chief medical examiner for Charles S., Jonah S. and Jennifer S. indicating that the

---

[3] The plaintiff states in its brief to this court that it does not contest its duty to defend the underlying cases and that it has paid for the defense of those cases.

[4] The policy provided that the plaintiff would pay damages for which the insured became legally obligated to pay arising from an "occurrence," which it defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in bodily injury or property damage." The policy also provided: "We do not cover any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, an insured person. . . . This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime."

manner of death for each of the decedents had been homicide.

The defendants objected to the motion for summary judgment. In support of their argument that there was a genuine issue of material fact as to whether Kelly's conduct had been intentional, the defendants presented to the court the transcript of the deposition of Ann H. Kazarian, Kelly's treating psychiatrist. Kazarian testified that she treated Kelly from April 27, 1998, through July 2, 1998. At her first office visit, Kelly appeared to be depressed and reported being anxious. Kelly stated that, since high school,[5] she had had mood problems. Her symptoms included a pounding heart, anxiety, confusion, difficulty getting things done and a sense of being overwhelmed. She stated to Kazarian that "[t]he baby[6] is gorgeous. I force myself to smile. He smiles back, but I can't feel it." Kelly also described her husband as "a beautiful husband" and maintained that he was very supportive of her.

Kelly told Kazarian that she had been suicidal at times and that she had been hospitalized in 1994 after taking an overdose of Xanax. During the 1994 episode, Kelly had refused to take the medications prescribed to treat her depression. She had been hospitalized again in 1995 when she had developed a desire to hang herself.

Kazarian's initial impression of Kelly was that she was severely depressed but not psychotic. She made a diagnosis of "recurrent major depression, severe." Kazarian prescribed Prozac to treat the condition. Kelly called the next day, April 28, 1998, and informed Kazarian that she had thrown the prescription away because she was nursing a baby and her husband was concerned about the effect that the medication would have on the baby. Kazarian warned Kelly about the

---

[5] Kazarian testified that Kelly was thirty years old in 1998.

[6] Jonah S. was born in January, 1998.

potential seriousness of her condition, especially in the postpartum period, and the likelihood that her depression and anxiety would recur. She authorized the pharmacy to refill the prescription. Kelly called Kazarian on May 4, 1998, however, and told her that, after obtaining the medication, she had thrown it away. Kelly also indicated that she was not doing well and had now decided that she would stop nursing and take the medication.

Kazarian saw Kelly again on May 5, 1998, and determined that her severe depression was worsening. She was more helpless, more hopeless, more anxious, not sleeping and unable to get things done. Kelly denied that she was suicidal at that time, but Kazarian was concerned that suicidal impulses might appear suddenly because her condition was changing rapidly and she had a history of impulsive decisions. Kazarian also knew that Kelly had had previous episodes of depression and that a person who has had three discrete episodes of serious depression has a 95 percent chance of experiencing additional episodes. In addition, Kazarian knew that Kelly previously had suffered from severe postpartum depression. She testified that, after one such episode, the likelihood of recurrence is "very, very, very high." Kazarian did not know at that time whether Kelly had had discrete episodes of depression or chronic depression, but the long-term prognosis was poor in either case. Kazarian prescribed additional medications and gave Kelly a list of persons to call if her suicidal impulses recurred.

Kazarian saw Kelly again on May 11, 1998. Kelly had been taking the medications, but had had a "terrible week." Kazarian prescribed additional medications and recommended that Kelly be hospitalized. She refused. On the evening of May 12, Kelly took an overdose of a variety of medications. She was found the next morning and admitted to a hospital. After Kelly was hospitalized, Kazarian determined that Kelly's moods swung from

depressed to hypomanic[7] and revised her diagnosis to "bipolar 2." She believed at that time that Kelly had a lifelong illness and that the frequency and severity of her periods of depressions were likely to increase over time. Kazarian spoke to Kelly's husband by telephone while Kelly was hospitalized and told him that she was concerned about the safety of their children because, in postpartum mood disorders, there is a known increased risk of infanticide. When Kazarian received the hospital's discharge summary several weeks later, she noted on it that she had changed the diagnosis to bipolar disorder, that Kelly had a history of noncompliance in taking medications and that, at the time of Kelly's hospitalization, her insight and judgment had been severely impaired.

Kelly was discharged from the hospital on May 20, 1998. She called Kazarian the next day and indicated that she was taking the medications that had been prescribed. Kelly denied at that time that she was suicidal, but Kazarian believed that she was still a definite suicide risk.

Kazarian saw Kelly again on June 2, 1998. At that time, she increased Kelly's medications because "she was still so stressed." On July 2, 1998, Kelly had another office visit and reported that she had stopped taking the medications. She stated that she now believed that her illness was the result of sin and that, if she followed the teachings of the Bible, she would recover. Kazarian told her that if she did not take the medications, there was a likelihood rising almost to a certainty that her depression and suicidal thoughts would recur.

Kazarian did not see Kelly again after the July 2, 1998 visit. She testified that the events of June 10, 1999, were consistent with her diagnosis of bipolar disorder and

[7] Kazarian defined a "hypomanic" state as an elevated mood, but not as elevated as manic.

were "the kind of thing that [she] worried about when [she] was taking care of [Kelly]." She also testified that a person with bipolar disorder may be incapable of controlling his actions at times and understanding the harmfulness of his conduct. Finally, she testified, to a reasonable medical certainty, that a diagnosis of bipolar disorder typically will progress without treatment and medication.

On cross-examination during her deposition, Kazarian testified that, during her treatment of Kelly, there had been times when Kelly seemed to know "exactly what she was doing and there were other times when . . . her understanding of the whole situation was abominable." She also testified that she did not believe that Kelly's noncompliant behavior was deliberate. Finally, she testified that, because she had not seen Kelly after July 2, 1998, she did not believe that she could give an opinion as to whether postpartum depression had impaired Kelly's ability to tell right from wrong, to control her actions or to form an intent during the events of June 10, 1999.

The defendants also presented to the trial court an affidavit by Walter Borden, a psychiatrist. Borden stated in his affidavit that he had reviewed the complaint in this case, the police report relating to the events of June 10, 1999, statements of witnesses, the medical examiner's report, electronic mail and other documents authored by Kelly, all of Kelly's medical records and the transcript of Kazarian's deposition. On the basis of his review of these documents, he stated: "In my opinion to a reasonable degree of medical probability, on June 10, 1999 Kelly was incapable of appreciating the nature of her behavior, unable to control herself and incapable of forming rational intent to do the acts attributed to her."

In its memorandum of decision on the plaintiff's motion for summary judgment, the trial court deter-

mined that the issue of whether Kelly's conduct was intentional within the meaning of the intentional conduct exclusion clause was governed by the Appellate Court's decision in *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 35 Conn. App. 94, 644 A.2d 933 (1994), rev'd on other grounds, 235 Conn. 185, 663 A.2d 1001 (1995). In that case, the Appellate Court concluded that an insured's mental condition may negate his intent and bar the application of an intentional act exclusion clause. Id., 106. Specifically, the court concluded that the clause would not apply if, "because of mental illness or defect, the insured did not understand the nature or wrongfulness of his conduct, or was deprived of the capacity to control his actions regardless of his understanding of the nature or wrongfulness of his action." Id., 106–107. The trial court, relying on the Appellate Court's decision in *Home Ins. Co.*, concluded that, although Kazarian's testimony established that Kelly had had a severe mental illness in July, 1998, it did not create a factual dispute as to whether Kelly was "legally insane" when she committed the acts of June 10, 1999. The trial court also determined that Borden's affidavit did not constitute a basis for denying the motion for summary judgment because it was conclusory and did not set forth any facts to support those conclusions. Accordingly, the trial court determined that there was no genuine issue of material fact as to whether Kelly had a mental condition negating her intent and barring application of the policy exclusion for intentional acts, and it therefore granted the plaintiff's motion for summary judgment.

The defendants then filed separate motions for reconsideration to which they attached a second affidavit by Borden in which he set forth the factual basis for the opinions contained in his first affidavit. The trial court denied the motions on the ground that "[a] motion to reargue is not to be used as an opportunity to present

new materials, such as [the] revised affidavit, that could have been presented at the time of the original argument."

The defendants claim on appeal that the trial court improperly: (1) determined that the allegations of the underlying negligence complaints did not sufficiently allege facts barring the application of the policy's intentional conduct exclusion clause;[8] (2) shifted the burden of proof to the defendants, as the nonmoving parties, to establish that there was a genuine issue of material fact; (3) determined that the evidence produced by the defendants was not sufficient to establish a genuine issue of material fact as to Kelly's mental condition on June 10, 1999; and (4) denied their motions for reconsideration. The plaintiff claims as alternate grounds for affirmance that coverage is barred by: (1) the policy's criminal acts exclusion clause; and (2) the policy's pollution exclusion clause. We reject the defendants' first and second claims but conclude that the trial court improperly determined that the evidence produced by the defendants was not sufficient to establish a genuine issue of material fact. We therefore do not reach the defendants' claim that the trial court improperly denied their motion for reconsideration. We reject both of the plaintiff's alternate grounds for affirmance and, accordingly, reverse the judgment of the trial court.

---

[8] In support of this claim, the defendants rely on the proposition that an insurer's duty to defend "does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage." (Internal quotation marks omitted.) *Moore* v. *Continental Casualty Co.*, 252 Conn. 405, 409, 746 A.2d 1252 (2000). As we have noted, the plaintiff does not dispute that it has a duty to defend Kelly's estate. See footnote 3 of this opinion. To the extent that the defendants claim that the trial court improperly required them to produce evidence to support the allegations in the underlying negligence complaints and in their counterclaims in this case in the absence of any proof by the plaintiff that there was no genuine issue of material fact, we address that claim later in this opinion.

## I

We first address the defendants' claim that the trial court improperly determined that there was no genuine issue of material fact that Kelly's conduct was intentional within the meaning of the intentional conduct exclusion clause. As a preliminary matter, we set forth the standard of review. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. 'The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact.'[9] 6 Moore, Federal Practice (2d Ed.) ¶ 56.15 [3]; *Plouffe* v. *New York, N.H. & H.R. Co.*, 160 Conn. 482, 488, 280 A.2d 359 (1971). As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent." *D.H.R. Construction Co.* v. *Donnelly*, 180 Conn. 430, 434, 429 A.2d 908 (1980). When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. See *Plouffe* v. *New York, N.H. & H.R. Co.*, supra, 491. Once the moving party has met its burden, however, "the opposing party must present evidence

[9] During oral argument before this court, the plaintiff argued that the burden was on the defendants to establish the truth of the allegations in their counterclaim that Kelly suffered from mental impairment. We express no opinion on that question. Regardless of which party has the ultimate burden of proof on that issue, the burden is on the plaintiff, as the party seeking summary judgment, to establish the absence of any genuine issue as to Kelly's mental condition.

that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § 380 [now § 17-45]." (Citations omitted; internal quotation marks omitted.) *Burns* v. *Hartford Hospital*, 192 Conn. 451, 455, 472 A.2d 1257 (1984). "Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 450, 820 A.2d 258 (2003).

"Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. . . . [T]his rule of construction favorable to the insured extends to exclusion clauses." (Citation omitted; internal quotation marks omitted.) *Travelers Ins. Co.* v. *Namerow*, 261 Conn. 784, 796, 807 A.2d 467 (2002).

In the present case, the plaintiff submitted in support of its motion for summary judgment copies of the complaints in the underlying negligence actions against Kelly's estate and the death certificates from the office of the chief medical examiner for Charles S., Jonah S. and

Jennifer S. indicating that the manner of death for each of the decedents had been homicide. The complaints alleged that Kelly had maliciously, wantonly or recklessly stabbed her husband and Jessica M., spread gasoline around the upstairs of the house, doused herself and Jessica M. with gasoline and set fire to the house, herself and Jessica M. The complaints also alleged that, at the time of these events, Kelly was suffering from a mental illness or impairment that rendered her incapable either of appreciating the nature, consequences and wrongfulness of her conduct or controlling her actions, or both. The plaintiff argued to the trial court that these documents established conclusively that Kelly's actions on June 10, 1999, were not negligent or reckless, but were intentional and, accordingly, fell within the policy's intentional conduct exclusion clause.

As the trial court noted in its memorandum of decision, however, the Appellate Court concluded in *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, supra, 35 Conn. App. 94, that an insured's intent to commit an act may be negated for purposes of an intentional conduct exclusion clause when "the insured did not understand the nature or wrongfulness of his conduct, or was deprived of the capacity to control his actions regardless of his understanding of the nature or wrongfulness of his action." Id., 106–107. The Appellate Court recognized in *Home Ins. Co.* that, in Connecticut, "mentally infirm persons face civil liability for intentional torts"; id., 104; but concluded that that does not "preclude a holding that the actions of such persons are regarded as unintentional for the purposes of an intentional action exclusion clause of an insurance policy because the principles have different justifications. Intentional act exclusion clauses were adopted primarily to prevent individuals from benefiting financially when they deliberately injured others. . . . An individual who lacks the capacity to conform his behavior to acceptable stan-

dards of society will not, however, be deterred by the existence or nonexistence of insurance coverage for injuries caused by his actions. . . . Therefore, the consideration of mental capacity when interpreting an exclusionary clause is not inconsistent with the purposes of such an exclusion. Furthermore, both principles meet the public interest in compensating victims for their injuries. Under a rule whereby damages caused by an insured's conduct are not denied coverage where the insured lacks a certain capacity, the injured person will have a redress for its damages even if the insured is judgment proof." (Citations omitted.) Id., 104–105.

The plaintiff does not ask this court to overrule *Home Ins. Co.*, and we adopt the Appellate Court's persuasive reasoning and holding in that case as the governing law herein.[10] It is clear to us that, under *Home Ins. Co.*, the

[10] The plaintiff did cite a number of cases standing for the unremarkable propositions that intent can be inferred from conduct and that intentional conduct by an insured falls within the intentional conduct exclusion clause. It argues that, under these cases, Kelly's intent can be inferred from her conduct. It does not explain, however, why, if the defendants can establish that Kelly did not understand the nature or wrongfulness of her conduct, her intent would not be negated under the principles enunciated in *Home Ins. Co.*

The plaintiff also argued that Kelly's conduct was not "accidental" and, therefore, was not an "occurrence" covered by the policy. To the extent that the plaintiff believes that *Home Ins. Co.* can be distinguished from the present case on the ground that that case did not involve any claim that the insured's conduct was not an "occurrence," we are not persuaded. The word "accident" has been defined as "[a]n *unintended* and unforeseen injurious occurrence"; (emphasis added) Black's Law Dictionary (7th Ed. 1999); "an occurrence *for which no one is responsible*"; (emphasis added) *Messina* v. *New Haven*, 119 Conn. 166, 168, 174 A. 188 (1934); and "an event of unfortunate character that takes place *without one's foresight or expectation.*" (Emphasis added; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 307, 765 A.2d 891 (2001), quoting *Arthur A. Johnson Corp.* v. *Indemnity Ins. Co. of North America*, 7 N.Y.2d 222, 228, 164 N.E.2d 704, 196 N.Y.S.2d 678 (1959). We conclude that, to the extent that Kelly engaged in conduct for which she could not be held responsible because her mental incapacity negated her intent, the consequences of her conduct were accidental and, therefore, an "occurrence" within the meaning of the policy.

crucial issue of fact in the present case is not whether Kelly's actions were intentional in the narrow sense that they were deliberate, but whether her intent was negated by her inability to understand the wrongfulness of her conduct or to control her conduct. The documents submitted by the plaintiff in support of its motion for summary judgment simply did not address that issue. Accordingly, we conclude that the trial court properly could have denied the plaintiff's motion in the absence of any objection or supporting documents filed by the defendants. See *Plouffe* v. *New York, N.H. & H.R. Co.*, supra, 160 Conn. 491.

After the defendants filed their objection to the plaintiff's motion with supporting documents, however, the plaintiff filed a reply memorandum in which it argued that the documents submitted by the defendants, specifically, Kazarian's deposition transcript, established that there was no genuine issue as to Kelly's mental condition on June 10, 1999. Although the defendants were not obligated to present documents in support of their objection to the plaintiff's motion; id.; the trial court was entitled to consider whether the evidence that they chose to present supported the plaintiff's claim. Cf. *Cinque* v. *Orlando*, 140 Conn. 591, 593, 102 A.2d 532 (1954) (although defendant was not obligated to put on evidence after his motion for nonsuit was denied, evidence that he did present could be used to establish plaintiff's case). Accordingly, we must determine whether the evidence that was presented by the defendants and relied on by the plaintiff established, prima facie, that there was no genuine issue of material fact and, if so, whether other evidence presented by the defendants supported their claim to the contrary.

In support of its motion, the plaintiff relied on Kazarian's testimony that: she believed that she was professionally obligated to decline to offer an opinion as to whether Kelly's mental condition had led to infanticide;

she had no way of knowing whether Kelly's mental condition impaired her ability to tell right from wrong on June 10, 1999; and she felt professionally obligated not to render an opinion as to whether the events of that morning resulted from postpartum depression. Kazarian declined to offer an opinion on these matters because she had not seen Kelly since July, 1998, and had no way of knowing the progress of her illness during that period. The plaintiff argued that Kazarian's testimony that it would be professionally irresponsible to offer an opinion on Kelly's mental condition on June 10, 1999, fatally undermined the credibility of the affidavit in which Borden, who had *never* seen Kelly, rendered an opinion, to a reasonable degree of medical certainty, that Kelly was unable to understand the nature of her behavior, to control her actions or to form a rational intent. The plaintiff further argued that, in the absence of any credible evidence establishing Kelly's mental condition, there was no genuine issue of material fact.

We agree that, standing alone, Kazarian's refusal to render an opinion as to Kelly's mental state on June 10, 1999, would cast serious doubt on the defendants' claim that Kelly's mental condition was seriously impaired on that date.[11] Considered as a whole, however, we believe that Kazarian's deposition testimony was not inconsistent with Borden's affidavit, but supported it. Kazarian testified that Kelly suffered from postpartum depression in 1998 and, as a general matter, the likelihood that a woman who has suffered from postpartum depression will experience recurrent epi-

---

[11] Accordingly, we reject the defendants' claims that the trial court improperly failed to take into account the allegations of the underlying complaints that Kelly was mentally incapacitated on June 10, 1999. When the defendants produced evidence supporting the plaintiff's claim that there was no genuine issue as to Kelly's state of mind, the trial court properly shifted the burden to them to produce evidence that there was such an issue.

sodes after subsequent births is "very, very, very high."[12] The evidence also showed that Kelly had given birth to Joshua two months before the events of June 10, 1999. As a matter of pure logic, it is a fair inference from this testimony that the likelihood that Kelly suffered from postpartum depression after Joshua S.'s birth in 1999 was "very, very, very high." Thus, notwithstanding Kazarian's reluctance to draw this inference,[13] her testimony provided a sufficient factual foundation for Borden's opinion, as set forth in his affidavit, that, to a reasonable degree of medical probability, Kelly suffered from "recurrent major depression, postpartum depression associated with a strong suicidal drive and a component of bipolar disorder on June 10, 1999." See *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 251–52, 654 A.2d 748 (1995) (for purposes of Practice Book § 17-25 [formerly § 381], expert's personal knowledge of facts is comprised of materials on which he may base his opinion, including medical records).

The trial court concluded, however, that even if Kelly suffered from this condition, "[t]he defendants do not

---

[12] Kazarian also testified that: a person who has had three discrete episodes of serious depression has a 95 percent chance of experiencing additional episodes; regardless of whether Kelly had had discrete episodes of depression or chronic depression, her long-term prognosis was poor; Kelly had a lifelong illness and the frequency and severity of her periods of depressions were likely to increase over time; and, to a reasonable medical certainty, a diagnosis of bipolar disorder will typically progress without treatment and medication.

[13] We note that, during Kazarian's deposition, the cross-examination questions were framed in categorical rather than probabilistic terms. Counsel for the plaintiff asked: "[A]m I correct in understanding that you do not have an opinion that *the illness led to infanticide in this case*?"; "[I]s it fair to say that you are not expressing an opinion that *the event resulted from postpartum depression?*"; "Would it also be fair to say that you are not prepared to render an opinion that *the illness you diagnosed prevented her from controlling her actions on the night of the event*?"; and "[W]ould it also be fair to say that you have no opinion that *Kelly S. was incapable of forming an intent due to her illness on the night of the event*?" (Emphasis added.) Kazarian's responses might well have been different if she had been asked her opinion as to the likelihood that these statements were true.

supply any authority for suggesting that bipolar disorder, even with suicidality, is congruent with the type of legal insanity that would constitute a defense to homicide." In support of its conclusion, the court cited *State* v. *Perez*, 182 Conn. 603, 610, 438 A.2d 1149 (1981), and *United Services Automobile Assn.* v. *Marburg*, 46 Conn. App. 99, 109–10, 698 A.2d 914 (1997). In *Perez*, however, this court merely stated that whether the defendant suffered from a mental impairment negating his criminal intent was a question of fact for the fact finder. *State* v. *Perez*, supra, 610. We did not suggest that undifferentiated schizophrenia without organic disorder, the impairment at issue in that case, could not meet the legal definition of insanity as a matter of law. In *Marburg*, the Appellate Court affirmed the trial court's ruling that a hearsay statement that the defendant had a predisposition to impulsive sexual promiscuity did not, in and of itself, give rise to an inference that the defendant was incapable of forming an intent to harm a child whom the defendant allegedly had abused sexually. *United Services Automobile Assn.* v. *Marburg*, supra, 109–10. In so concluding, however, the court did not suggest that *no* amount of evidence could be sufficient to give rise to such an inference. Thus, *Perez* and *Marburg* do not stand for the proposition that certain mental conditions cannot meet the test for negation of intent as a matter of law.

In the present case, Kazarian testified that she was concerned about the safety of the S. children because in postpartum mood disorders, there is a known increased risk of infanticide and at the time of Kelly's hospitalization in May, 1998, her insight and judgment had been severely impaired. Kazarian stated that the events of June 10, 1999, were consistent with her diagnosis of bipolar disorder and were "the kind of thing that [she] worried about when [she] was taking care of [Kelly]." She also noted that a person with bipolar disorder may

be incapable at times of controlling her actions and understanding the harmfulness of her conduct and, to a reasonable medical certainty, that a diagnosis of bipolar disorder will typically progress without treatment and medication. Kazarian also testified that Kelly had told her that her baby, Jonah S., was "gorgeous" and that her husband was "beautiful" and very supportive of her. A fact finder reasonably could infer from this testimony that Kelly's conduct on June 10, 1999, was not driven by animus against her family but by an irrational compulsion. In addition, Borden stated in his affidavit that he believed, to a reasonable degree of medical probability, that Kelly's mental impairment met the standards for negation of intent. We therefore conclude that this evidence was sufficient to establish a genuine issue of fact as to whether Kelly's conduct was intentional within the meaning of the policy's intentional conduct exclusion clause.

## II

We next turn to the plaintiff's first alternate ground for affirmance that there is no genuine issue of material fact as to whether Kelly's conduct was covered by the policy's criminal conduct exclusion clause. The plaintiff argued in its brief to this court that, had Kelly survived, she could have been charged with various criminal offenses, thereby placing her conduct within the policy exclusion. At oral argument before this court, the plaintiff further argued that the exclusion would apply even if Kelly could not have been convicted of any crime because a reasonable policyholder would understand the phrase "criminal acts" to refer to any conduct that a layperson would perceive as criminal, regardless of whether a defense to criminal charges could be established. The defendants counter that a reasonable policy holder would understand the phrase "criminal acts" to refer to conduct for which a person could be convicted and punished. We agree with the defendants.

The defendants point us to two cases that are directly on point. See *Essex Ins. Co.* v. *Davidson*, 248 F.3d 716 (8th Cir. 2001); *Swift* v. *Fitchburg Mutual Ins. Co.*, 45 Mass. App. 617, 700 N.E.2d 288, cert. denied, 428 Mass. 1108, 707 N.E.2d 366 (1998). In *Davidson*, the claimant's son was receiving treatment for schizophrenia from the insured, a non-profit corporation. On May 14, 1996, the claimant called the insured to request assistance with her son and the insured sent an employee to their home. The employee spoke with the son, the claimant and her husband and then left. The son later killed the claimant's husband and was charged with second-degree murder. He was found not guilty by reason of mental illness under Minnesota law because " 'he was incapable of appreciating the nature of his acts or that they were wrong.' " *Essex Ins. Co.* v. *Davidson*, supra, 717. The claimant brought a negligence action against the insured. Id. The insurer then brought a declaratory judgment action in the federal District Court claiming that there was no coverage because the son's conduct fell within a policy exclusion for acts of battery. Id. The trial court concluded that the battery exclusion was inapplicable because the son could not have formed the intent to commit battery. Id., 717–18.

The insurer appealed, arguing that "the battery exclusion applies when there is proof of intent to act but no proof of intent to injure. This is so because to commit a battery one need not intend the harm that results from an act." Id., 718. The Court of Appeals for the Eighth Circuit affirmed the judgment of the trial court. It noted that the Minnesota Supreme Court previously had held that "an insane person, within the meaning of the criminal law, lacked the cognitive ability to form the intent to injure another" for purposes of determining whether conduct is intentional within the meaning of an intentional conduct exclusion clause. Id., 720, citing *State Farm Fire & Casualty Co.* v. *Wicka*, 474 N.W.2d

324 (Minn. 1991). It also rejected the plaintiff's argument that proof of intent to act was sufficient to establish battery under Minnesota criminal law. *Essex Ins. Co.* v. *Davidson*, supra, 248 F.3d 719. Instead, it determined that battery required proof of either "an intent to harm or an intent to cause offensive contact." Id. The court then noted that the defendant's acquittal on insanity grounds necessarily established that he had neither intent. Id., 720. The court concluded that it would be inconsistent with the Minnesota court's decision in *Wicka* to hold that, if a person does not have the requisite intent to commit battery, the conduct is covered by the battery exclusion clause. Id.

In *Swift* v. *Fitchburg Mutual Ins. Co.*, supra, 45 Mass. App. 618, 620, the insured, who had attacked several people with a knife and a shovel, was charged with various criminal offenses and found not guilty by reason of insanity. Two of the victims thereafter brought a civil action against the insured alleging assault and battery. The victims also alleged that the insured had been negligent in failing to take prescribed medications to control his propensity for violence. Id., 619. The trial court rendered judgment in favor of the victims on the negligence claim. Id., 621. Because the insurer previously had denied coverage on the ground that the conduct was covered by the criminal conduct exclusion, the victims filed an action against the insurer alleging, inter alia, breach of the duty to defend and indemnify the insured. Id. The trial court rendered judgment for the insurer, reasoning that, "[a]s the insured performed the physical acts that produced the injuries, it should make no difference . . . that the insured was mentally irresponsible at the time." Id., 622.

The Massachusetts Appeals Court reversed the trial court's judgment. With respect to the allegations that the insurer had breached its duty to indemnify, the court first concluded that the criminal conduct exclusion was

irrelevant to the victims' claim that the insured had been negligent in failing to take his medication. Id., 626. The court also concluded that, even if the negligence claim were disregarded, the criminal conduct exclusion was not applicable to conduct engaged in while the insured was mentally incapacitated. Id. The court noted that the trial court had assumed, without explanation, that "criminal acts," as used in the exclusion clause, meant "the actus reus without any ingredient of a mental element" and, accordingly, the insured had committed a criminal act within the meaning of the exclusion even though he had been acquitted. Id. In the court's opinion, however, the more natural reading of the language was that "the actus reus must have been voluntary (knowing), and where the actor is mentally disabled, that element is lacking." Id. Moreover, the court noted, the purpose of the exclusion "has been to forbid insurance protection of criminal activities and thereby to discourage such activities. It is questionable whether that purpose is served by denying protection to an insured who was incapable of forming a criminal intention." Id., 627. The court concluded that the most reasonable interpretation of the exclusion, from the viewpoint of the insured, "is that a person who is not convicted, or convictable, of a crime has not committed a criminal act, or that a person who is incapable of rational thinking or action at the time has not committed a criminal act. We think, further, that it would weigh with the insured in defining his expectation of coverage that the effect of adopting the insurer's interpretation would be to deny protection under a liability policy to a guiltless policyholder as well as to innocent victims, which might appear a strange and unseemly result." Id., 628.[14]

---

[14] The court in *Swift* noted that some insurance companies have excluded coverage for "[a]n act or omission which is criminal in nature and committed by an insured person who lacked the mental capacity to appreciate the criminal nature or wrongfulness of the act or omission or to conform his or her conduct to the requirements of the law or to form the necessary

We are persuaded by the reasoning of these cases, which is consistent with the Appellate Court's reasoning in *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, supra, 35 Conn. App. 94. Accordingly, we reject the plaintiff's interpretation of the criminal conduct exclusion clause and conclude that "criminal acts," within the meaning of that clause, are acts for which the insured was or could be convicted under applicable criminal law.

As the Appellate Court stated in *Home Ins. Co.*, which we have adopted as the governing law in this opinion, the standard for determining whether an insured's conduct is intentional within the meaning of the intentional conduct exclusion clause is "consistent with our test for mental capacity in the criminal context. See General Statutes § 53a-13 (a)."[15] Id., 107 n.9. We have concluded that there is a genuine issue of material fact as to whether Kelly's mental incapacity on June 10, 1999, negated her intent within the meaning of the intentional conduct exclusion clause. We also conclude that there is a genuine issue of material fact as to whether Kelly's mental incapacity negated her criminal intent within the meaning of the criminal conduct exclusion.

In support of its argument to the contrary, the plaintiff relies on several cases from other jurisdictions standing for the proposition that when an insured is convicted of criminal conduct that does not involve a specific intent to injure the victim, the conduct is nevertheless

intent under the law." (Internal quotation marks omitted.) *Swift* v. *Fitchburg Mutual Ins. Co.*, supra, 45 Mass. App. 628 n.14. The court also noted that such provisions have received "rather unfriendly treatment" from certain courts. Id., 628.

[15] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

covered by the criminal conduct exclusion clause.[16] The question before us, however, is whether conduct for which the insured *could not be convicted* because he lacked the mental capacity to form a culpable intent is covered by the criminal conduct exclusion clause. Accordingly, the plaintiff's reliance on these cases is misplaced.

The only case cited by the plaintiff that involves a claim of mental incapacity is *Allstate Ins. Co.* v. *Raynor*, 143 Wash. 2d 469, 21 P.3d 707 (2001). In that case, the insured fatally shot his neighbor and her young daughter and then committed suicide. Id., 471. He had a history of violent behavior and had become enraged because his neighbors were raising rabbits on their property. Id., 471–72. The defendant, the daughter's father, brought a wrongful death action against the insured, among others. Id., 474. The plaintiff insurance company then filed a declaratory judgment action claiming that the insured's conduct fell within the policy's criminal conduct exclusion clause and filed a motion for summary judgment. Id., 474–75. In support of its motion, the plaintiff presented a statement by a psychiatrist that, although the insured's mental capacity to form intent was seriously compromised, the psychiatrist did not believe that the insured met the insanity standard under Washington

---

[16] See *Allstate Ins. Co.* v. *Brown*, 16 F.3d 222 (7th Cir. 1994) (under Minnesota law, conviction for criminal recklessness constituted criminal conduct for purposes of criminal conduct exclusion); *American Family Mutual Ins. Co.* v. *White*, 204 Ariz. 500, 504, 65 P.3d 449 (2003) (conviction for reckless assault constituted violation of criminal law for purposes of criminal conduct exclusion); *20th Century Ins. Co.* v. *Schurtz*, 92 Cal. App. 4th 1188, 1192–96, 112 Cal. Rptr. 2d 547 (2001) (conviction for assault with firearm constituted criminal conduct for purposes of criminal conduct exclusion); *Allstate Ins. Co.* v. *Juniel*, 931 P.2d 511 (Colo. App. 1996) (conviction for second degree felony assault and misdemeanor menacing constituted criminal conduct for purposes of criminal conduct exclusion when conduct was reckless); *Allstate Ins. Co.* v. *Sowers*, 97 Or. App. 658, 661, 776 P.2d 1322 (1989) (conviction for resisting arrest constituted criminal conduct for purposes of criminal conduct exclusion).

criminal law at the time of the incident. Id. The trial court granted the plaintiff's motion for summary judgment. Id. On appeal, the Washington Supreme Court affirmed the judgment. It noted that "a criminal act exclusion does not apply to *all* acts technically classified as crimes, but only to serious criminal conduct done with malicious intent, from evil nature, or with a wrongful disposition to harm or injure other persons or property." (Emphasis in original; internal quotation marks omitted.) Id., 477–78. The court concluded that "[t]he record is unequivocal that [the insured] was able to perceive the nature and quality of his actions—i.e., pointing a loaded firearm directly at [his neighbors] and repeatedly pulling the trigger at close range—*and* that he was able to understand the wrongfulness of those actions. Thus, whether or not he was suffering diminished mental capacity at the time, [the insured] clearly engaged in *serious* criminal conduct done with, at the very least, 'a wrongful disposition to harm or injure other persons.'" (Emphasis in original.) Id., 478. Specifically, the court concluded that the insured's "actions clearly contained all the elements of several crimes, including second degree manslaughter . . . a charge against which evidence of diminished mental capacity we have held to be unavailing as a defense." (Citation omitted.) Id., 478 n.8. The court also rejected the argument that a criminal act exclusion clause applies only to acts resulting in a conviction, reasoning that "[n]o reasonable insurance purchaser would consider a criminal act somehow less criminal simply because a suicide or some other circumstance prevented its prosecution in a court of law." Id., 476 n.4. Thus, like the other cases relied on by the plaintiff in the present case, *Raynor* merely stands for the proposition that, when an insured could be convicted of a crime, the conduct falls under the criminal conduct exclusion clause regardless of the level of his subjective intent. It does not support the

plaintiff's argument that, when an insured lacks the mental capacity to form an intent so that he could not be convicted of any crime under governing criminal law, the conduct nevertheless falls under the exclusion. Accordingly, we reject the plaintiff's argument.

## III

Finally, we address the plaintiff's second alternate ground for affirmance that the incident fell within the policy's pollution exclusion clause.[17] The plaintiff argued in its brief to this court that the exclusion applies because Jennifer S. and Jonah S. died from smoke inhalation and thermal burns following a "non-accidental" discharge of pollutants. In their reply brief, the defendants point out that the policy specifically lists "smoke" as a *covered* cause of loss to personal property, while it excludes loss to personal property caused by "[v]apors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants." The defendants contend, therefore, that the policy distinguishes between "pollution" and "smoke." In response to this argument, the plaintiff argued at oral argument before this court—for the first time—that the bodily injuries to Jennifer S. and Jonah S. were caused by carbon monoxide poisoning.[18] It is not entirely clear whether the plaintiff, by

[17] The policy provides: "We do not cover any bodily injury which results in any manner from the discharge, dispersal, release or escape of vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants.

"We do cover bodily injury which results from such discharge if the discharge is sudden and accidental."

[18] The medical examiner analyzed the blood of both children for the presence of carbon monoxide. The carboxyhemoglobin saturation of the blood was 28.9 percent for Jonah S. and 18.6 percent for Jennifer S. Nothing in the medical examiner's reports indicates that carbon monoxide poisoning caused their deaths.

The plaintiff represented to this court at oral argument that it had argued to the trial court that the children's injuries had been caused by carbon monoxide. Our review of the record reveals that, to the contrary, the plaintiff argued in its brief on the motion for summary judgment that the children

arguing that the two children died of carbon monoxide poisoning rather than smoke inhalation, intended to concede that bodily injury caused by smoke from an accidental house fire is covered under the policy, while continuing to maintain that the pollution exclusion applies to the toxic components of the smoke, but we assume for the purposes of this opinion that it did not. We conclude that smoke from a house fire, including any component of such smoke, is not covered by the pollution exclusion clause at issue in the present case.

The plaintiff has not provided, and our research has not revealed any authority for the proposition that smoke from a house fire is covered by the pollution exclusion clause.[19] The dearth of such cases is under-

"inhaled smoke in toxic levels such that they were poisoned and killed" and argued at the hearing on the motion that "the cause of death for the two minor children was smoke inhalation and smoke is clearly a pollutant as defined by the policy." We note, however, that the medical examiner's reports listed *both* thermal burns and smoke inhalation as the causes of the children's deaths. Accordingly, even if we were to conclude that smoke was an excluded cause of injury, which we do not, there would be a genuine issue of fact as to whether the deaths were caused by smoke inhalation.

[19] Our research has revealed that a number of courts have concluded that carbon monoxide emissions in residential buildings are not pollutants within the meaning of the pollution exclusion clause. See *Thompson* v. *Temple*, 580 So. 2d 1133, 1134–35 (La. App. 1991) (because pollution exclusion clause was intended to exclude coverage for active industrial polluters, genuine issue existed as to whether exclusion covered tenant's injury from carbon monoxide emitted by negligently maintained bathroom heater); see also *Kenyon* v. *Security Ins. Co. of Hartford*, 163 Misc. 2d 991, 996–98, 626 N.Y.S.2d 347 (1993) (pollution exclusion clause was intended to ensure that polluters bear cost of wrongdoing and did not cover injury to condominium resident by release of carbon monoxide from improperly installed water heater), aff'd, 206 App. Div. 2d 980, 616 N.Y.S.2d 133 (1994), appeal denied, 84 N.Y.2d 813, 647 N.E.2d 453, 623 N.Y.S.2d 181 (1995). The courts in these cases reasoned that pollution exclusion clauses primarily were intended to protect insurance companies from liability for costs to remediate environmental damage from active industrial pollution. Courts have also considered the application of the pollution exclusion to injuries caused by other substances found in residential settings. See *Grinnell Mutual Reinsurance Co.* v. *Wasmuth*, 432 N.W.2d 495, 498–501 (Minn. App. 1988) (because qualified pollution exclusion was intended to exclude coverage for polluters who "knew or should have known their actions would cause harm" and because

standable, at least with respect to "qualified" pollution exclusion clauses, like the one in the present case.[20] House fires generally fall into two categories: those that are sudden and accidental, and those that are not. The former fall within the exception to the qualified pollution exclusion clause and the latter generally would be covered by intentional or criminal conduct exclusion clauses. Thus, even if the plaintiff were correct that smoke from a house fire is a pollutant within the meaning of the clause, there are no circumstances under which a qualified pollution exclusion clause would operate to bar coverage that would otherwise be available.

In any event, in the present case, we are persuaded by the defendants' argument that, under the terms of the policy, smoke from a house fire is not an excluded cause of bodily injury. Under the personal property

insured reasonably would have believed that release of formaldehyde was "sudden," exclusion did not cover contractor's negligent installation of insulation that injured homeowners by emitting formaldehyde fumes), overruled by *Board of Regents of the University of Minnesota* v. *Royal Ins. Co. of America*, 517 N.W.2d 888, 892–93 (Minn. 1994) ("sudden and accidental" provision was not ambiguous, but release of contaminant within building was not release into "atmosphere" as used in pollution exclusion clause); see also *General Accident Ins. Co. of America* v. *Idbar Realty Corp.*, 163 Misc. 2d 809, 812–13, 622 N.Y.S.2d 417 (1994) (pollution exclusion clause applied only to claims for injuries from industrial environmental pollution and did not cover realty company's negligence in failing to correct condition whereby apartment resident was injured by ingesting lead paint chips), modified on other grounds, 229 App. Div. 2d 515, 646 N.Y.S.2d 138 (1996). Because we conclude that, under the specific terms of the policy at issue in the present case, a reasonable policyholder would believe that "smoke" was expressly excepted from the pollution exclusion clause, we need not consider whether a reasonable policyholder would believe that smoke from a house fire or carbon monoxide contained in that smoke would be excluded pollutants in the absence of such an exception.

[20] "Absolute" pollution exclusion clauses do not contain an exception for sudden and accidental discharges. "Qualified" pollution exclusion clauses, such as the one at issue in this case, do contain such an exception. See *Doerr* v. *Mobil Oil Corp.*, 774 So. 2d 119, 126–27, modified on other grounds, 782 So. 2d 573 (La. 2002); see also id., 140 n.6 (Victory, J., dissenting).

section of the policy, the policy lists both the specific causes of losses that are covered and those that are not covered. "Smoke" is a covered cause of loss. "Vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants" are not. Under the family liability section of the policy, which covers liability for bodily injury, the policy does not specify the causes of losses that are covered. The policy does specify that "[w]e do not cover any bodily injury which results in any manner from the discharge, dispersal, release or escape of vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants." We conclude that a reasonable policyholder would believe that any causes of bodily injury that are not specifically excluded are covered. We further conclude that, because the personal property section of the policy distinguishes smoke from the excluded pollutants, which are identical to the excluded pollutants in the family liability section, a reasonable policyholder would conclude that smoke is not a pollutant for purposes of the pollution exclusion in the family liability section, but is a covered cause of bodily injury.

The plaintiff implicitly argues that even if bodily injury from smoke is covered, injuries from toxic components within the smoke, such as carbon monoxide, are not. We disagree. If the plaintiff's interpretation were correct, then, presumably, the policy would provide coverage for losses caused only by smoke that does not contain any "vapors, fumes . . . toxic chemicals, toxic gasses . . . waste materials or other irritants, contaminants or pollutants." We do not believe that a reasonable policyholder would understand "smoke" to be limited to substances that lack any of these components. Accordingly, we conclude that injuries caused by the toxic components of smoke from a

house fire are covered by the insurance policy in the present case.

The judgment is reversed and the case is remanded to the trial court for further proceedings according to law.

In this opinion the other justices concurred.